UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| DARCY D. CHAPMAN,<br><br>                    Plaintiff,<br><br>        vs.<br><br>CAROLYN W. COLVIN,<br>COMMISSIONER OF SOCIAL<br>SECURITY;<br><br>                    Defendant. | 4:16-CV-04004-LLP<br><br><br>REPORT AND RECOMMENDATION |

## INTRODUCTION

Plaintiff, Darcy D. Chapman, seeks judicial review of the Commissioner's

final decision denying her payment of disability insurance benefits under Title

II of the Social Security Act.[1] Ms. Chapman has filed a complaint and has

---

[1]SSI benefits are sometimes called "Title XVI" benefits, and SSD/DIB benefits are sometimes called "Title II benefits." Receipt of both forms of benefits is dependent upon whether the claimant is disabled.  The definition of disability is the same under both Titles.  The difference –greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history.  There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any.  There are corresponding and usually identical regulations for each type of benefit.  See e.g. 20 C.F.R. § 404.1520 and § 416.920 (evaluation of disability using the five-step procedure under Title II and Title XVI).  In this case, Ms. Chapman filed her application for Title II benefits only.  AR 203, 384-85.  Her coverage status for SSD benefits expired on June 30, 2016.  AR 204.  In other words, in order to be entitled to Title II benefits, Ms. Chapman must prove she was disabled on or before that date.

requested the court to reverse the Commissioner's final decision denying her disability benefits and to enter an order awarding benefits.   Alternatively, Ms. Chapman requests the court remand the matter to the Social Security Administration for further hearing.  The matter is fully briefed and has been referred to this magistrate judge for a report and recommendation.  For the reasons more fully explained below, it is respectfully recommended to the district court that the Commissioner's decision be reversed and remanded.

## JURISDICTION

This appeal of the Commissioner's final decision denying benefits is properly before the district court pursuant to 42 U.S.C. § 405(g).  This matter was referred to this magistrate judge pursuant to 28 U.S.C. § 636(b) and the October 16, 2014, standing order of the Honorable Karen E. Schreier, district judge.

## STIPULATED FACTS[2]

### A.    Statement of the Case

This action arises from Plaintiff, Darcy D. Chapman's, application for SSDI benefits protectively filed on December 21, 2012, alleging disability since September 26, 2011, due to diabetes, bipolar disorder, depression, epigastric abdominal pain, neck pain, gastroesophageal reflux, generalized anxiety disorder, asthma, hearing loss in the left ear, irritable bowel syndrome, PTSD,

---

[2] The stipulated facts were agreed upon and submitted by the parties.  See Docket 11.  The paragraph numbers have been deleted and a few headings have been altered by the court. Some grammatical and/or stylistic changes have been made.  Otherwise, the stipulated facts are recited in this opinion from the parties' submission.

2

high cholesterol, diverticulitis, ovarian cysts, gout, memory loss, and fibromyalgia.  AR 384, 433, 462, 483, 487 (citations to the appeal record will be cited by "AR" followed by the relevant page or pages therein).

Ms. Chapman's claim was denied initially and upon reconsideration. AR 325, 331.  Ms. Chapman then requested an administrative hearing. AR 338.

A hearing was held on April 21, 2014, before the Honorable Robert Maxwell, administrative law judge ("ALJ").  AR 244.  Ms. Chapman had different counsel at the administrative level of these proceedings.  AR 244.  The ALJ issued an unfavorable decision on May 15, 2014.  AR 200.

At step one of the evaluation, the ALJ found Ms. Chapman had not engaged in substantial gainful activity, ("SGA"), since June 21, 2012.[3]  AR 207.

At step two, the ALJ found Ms. Chapman had severe impairments including diabetes mellitus, fibromyalgia, obesity, bipolar disorder, anxiety disorder, personality disorder, and substance use disorder.  AR 207.

---

[3] The Social Security regulations set forth a sequential method of evaluating disability claims.  20 CFR § 404.1520(b).  The first step is to determine whether the claimant is engaging in substantial gainful activity.  If so, the claim is denied.  If not, the second step is to determine whether the claimant has a severe impairment, i.e., an impairment which establishes more than only slight abnormalities that do not significantly limit any basic work activity. 20 CFR § 404.1521; SSR 85-28.  If not, the claim is denied.  If a severe impairment is present, the third step is to determine whether it meets or equals one of the impairments listed in 20 CFR Part 404, Subpart P, App. 1. 20 CFR § 404.1520(d).  If it does, a finding of disability is directed.  Id.  If not, the fourth step is to determine whether the claimant has an impairment that precludes the performance of past relevant work.  20 CFR § 404.1520(f).  If not, the claim is denied.  Id.  If so, the fifth step is to determine whether the claimant's impairments prevent the performance of any other work, considering residual functional capacity, age, education and work experience. 20 CFR § 404.1520(g).

The ALJ found Ms. Chapman's alleged abdominal pain, gastroesophageal reflux, irritable bowel syndrome, diverticulitis, and ovarian cysts were medically determinable impairments, but were not severe.  AR 207.

The ALJ found Ms. Chapman's alleged hypotension and carpal tunnel were medically determinable impairments, but were not severe because they did not impact her ability to perform basic work-related activities.  AR 208.

The ALJ found Ms. Chapman did not have an impairment that met or medically equaled one of the listed impairments in 20 CFR 404, Subpart P, App. 1 (20 CFR § 404.1520(d)) (hereinafter referred to as the "Listings"). AR 209.

In making the finding that Ms. Chapman did not meet or equal a Listing, the ALJ found she had mild limitations in activities of daily living; moderate limitations in social functioning and concentration, persistence, or pace; and no repeated episodes of decompensation, each of extended duration. AR 209-10.

The ALJ stated, "the medical evidence in this record does not show laboratory or clinical findings regarding the claimant's fibromyalgia, diabetes, or in combination with her obesity, that meets or medically equals a Listing. Moreover, the record does not contain an opinion from a treating or examining acceptable medical source to support the finding of listing-severity of the claimant's severe impairments."  AR 209.  The ALJ's decision does not document that he considered whether Ms. Chapman's fibromyalgia was equivalent to Listing 14.09D.

4

The ALJ determined Ms. Chapman had the residual functional capacity, ("RFC"), to perform:

> less than a full range of light work as defined in
> 20 CFR § 404.1567(b).  The claimant is able to lift and/or carry
> 20 pounds occasionally and 10 pounds frequently; stand
> and/or walk for a total of 6 hours of an 8-hour workday with
> normal breaks; and sit for a total of 6 hours of an 8-hour
> workday with normal breaks.  The claimant has no limitations
> in push and/or pull actions, except for the same resistance as
> lifting and carrying.  From a postural stand point, the claimant
> is limited to frequently climbing ramps and stairs; occasionally
> climbing ladders, ropes, or scaffolds; occasionally stooping,
> kneeling, crouching, and crawling; and unlimited balancing.
> The claimant has no manipulative or visual limitations.  The
> claimant has limitation in hearing with the left ear, but she has
> no difficulty with hearing in the right ear and no problematic
> hearing loss.  The claimant must avoid concentrated exposure
> to hazards.  From a mental perspective, the claimant is limited
> to understanding, remembering, and carrying out routine tasks;
> and no more than occasional contact with the general public.

AR 211.

The ALJ's credibility finding regarding Ms. Chapman's statements concerning the intensity, persistence and limiting effects of her symptoms was that they were "not entirely credible for the reasons explained in this decision." AR 212.

The ALJ then provided the reasons for his credibility assessment. AR 212-14.  He accepted her testimony that fibromyalgia and chronic pain impacted her ability to perform basic work-related activity, but found the objective medical evidence of record did not fully support the credibility of her allegations.  AR 212.  The ALJ noted examinations showed her gait and muscle strength/tone were within normal limits, with no signs of joint problems, and that a June 2013 examination showed her joints were normal with a full range

of motion and no active swelling or synovitis at any joint.  AR 212.  He found
the medical record showed Ms. Chapman had experienced symptoms of
fibromyalgia, but that the medical findings did not reflect the loss of strength,
limited range of motion, or fatigue to support her allegation of disability.
AR 212.

Regarding her allegations of pain, the ALJ noted Ms. Chapman had
reported to a clinic that medication alleviated her pain and calmed her anxiety,
and an increase of Cymbalta helped her mood and fibromyalgia pain.
AR 212-13.  The ALJ noted Ms. Chapman denied pain in February, 2014, and
based on a review of the entire record, found the overall level of her treatment
for chronic pain and reported positive effects from pain medication did not
suggest disabling pain.  AR 213.

Regarding her allegation of disability due to diabetes, the ALJ found the
medical evidence showed Ms. Chapman's diabetes improved on a medication
regimen.  AR 213.  The ALJ found the objective medical evidence did not show
documented "sequelae, such as neuropathy, ketoacidosis, or other
complications from the claimant's diabetes."  AR 213.

Regarding her mental ability, the ALJ stated he considered her
testimony, longitudinal treatment history, a neuropsychological evaluation, and
other psychiatric evaluations and mental status examinations and determined
she would be able to sustain routine tasks.  AR 213.  Regarding her testimony
about having a history of getting along with others, the ALJ noted the record
showed she socialized with friends, one of whom she had contact with on a

daily basis, and others that she contacted three to four times each month. AR 214. The ALJ noted Ms. Chapman's report that she got along with her significant other, with no significant fighting or arguing over the prior one to two years. AR 214. The ALJ also noted Ms. Chapman was slightly guarded but cooperative and pleasant during interaction with a mental health provider. AR 214.

Regarding her testimony that she did not have funds to pay for medications, the ALJ noted Ms. Chapman had not identified a medication she could not afford for mental health symptoms since June 21, 2012. AR 214. He noted treatment records showed regular visits for prescribed psychiatric medications and no notes suggesting Ms. Chapman was denied appropriate medications due to financial reasons. AR 214.

The ALJ considered the opinions of the state agency medical consultants, giving their opinions "great weight" in regard to medical and psychological limitations because he found them consistent with longitudinal medical evidence, objective examinations by treatment sources, and the record as a whole. AR 214-15.

The ALJ discussed the neuropsychological evaluation performed by Dr. McGrath, but did not state what weight he gave Dr. McGrath's recommendations. AR 213.

At step four, the ALJ found that based on her RFC, Ms. Chapman was unable to perform her past relevant work. AR 216.

Relying on testimony from a vocational expert, the ALJ found Ms. Chapman could perform other work existing in significant numbers, including collator operator, motel house cleaner, and small parts assembler. AR 217.

Ms. Chapman timely requested review by the Appeals Council on June 26, 2014, (AR196), and submitted additional evidence.

Ms. Chapman submitted a medical source statement from her treating physician on February 19, 2015, which addressed limitations dating back to September 26, 2011.  AR 1364-68.  The Appeals Council considered this evidence and included it in the record as Exhibit B20F.  AR 2, 5.

Ms. Chapman submitted the following additional evidence on February 19, 2015:

* Medical records from Southeastern Behavioral Health:
  - Psychiatric records for 4/7/14 to 12/29/14
  - Caseworker records for 3/31/11 to 1/27/15

* Medical records from Sanford Rheumatology Clinic for 12/31/13 to 1/15/14

* Medical records from Sanford Family Medicine Clinic for 8/9/13 to 2/2/15, submitted in two parts.

The Appeals Council considered some of the evidence from Southeastern Behavioral Health submitted on February 19, 2015, and included it in the record at Exhibit B23F.  AR 2, 5, 1599-1611.  Other evidence was already in the administrative record.  AR 1287-92.

The Appeals Council included some of the other evidence from Southeastern Behavioral Health submitted on February 19, 2015 (AR 2, 5,

177-88), and the Appeals Council failed to consider or include in the transcript Southeastern Behavioral Health Caseworker treatment notes from 3/31/11 to 5/2/13.

The Appeals Council considered some of the evidence from Sanford Family Medicine Clinic submitted on February 19, 2015, and included it in the record at Exhibit B22F.  AR 2, 5, 1404-1598.

The Appeals Council included some of the other evidence from Sanford Family Medicine Clinic submitted on February 19, 2015, (AR 2, 5, 9-168), and the Appeals Council failed to consider or include in the transcript medical test results from 6/8/14 to 10/1/14 submitted with Part 2 of the Sanford Family Medicine Clinic submission on February 19, 2015.[4]

The Appeals Council denied Ms. Chapman's request for review on December 1, 2015, making the ALJ's decision the final decision of the Commissioner.  AR 1.  Ms. Chapman then timely filed this action.

**B.    Plaintiff's Age, Education and Work Experience**

Ms. Chapman was born June 11, 1962, making her almost 52 years old at the time of the decision.  AR 384.  Ms. Chapman completed the 12th grade and completed a vocational technical program in cosmetology in 2001. AR 434.

The ALJ relied on the vocational expert who identified Ms. Chapman's past work as a caretaker, night supervisor, sleep technician, office

---

[4] In their stipulated facts, (Docket 11) the parties indicated they had attached as Exhibits A and B those portions of the records which the Appeals Council failed to consider or include in the administrative transcript.  There were, however, no exhibits attached to Docket 11.

coordinator/medical testing, assistant manager/convenience store,

phlebotomist, and resident manager of apartments.  AR 216, 491.

Ms. Chapman listed 23 different jobs she performed from 1997 to 2011.

AR 449, 456.  Ms. Chapman testified she had worked at 68 jobs.  AR 250.

## C.    Relevant Summary of Medical Evidence

### 1.    Sanford Family Medicine Clinic

The earliest treatment notes in the appeal record from

Douglas H. Geise, M.D., Ms. Chapman's primary care provider, were August 24

and 25, 2011, notes showing Dr. Geise provided Ms. Chapman[5] a note to miss

work following an exam for bronchitis.  AR 580, 616.  Ms. Chapman's problem

list at that time included depression, abdominal pain, neck pain, GERD, and

bipolar disorder, but she denied any abdominal or flank pain, nausea, vomiting

or change in bowel habits.  AR 616-18.  Her medical history at that time also

included irritable bowel syndrome ("IBS"), carpal tunnel, and vertigo.  AR 619.

On November 1, 2011, Ms. Chapman requested a refill of her

hydrocodone for back and neck pain because she had missed a step.  She

requested a refill without an office visit because she was unemployed and had

no insurance.  AR 582.  On December 7, 2011, Ms. Chapman was seen for

neck and back pain after she had missed a step and fell.  AR 627.  The neck

pain was causing constant headaches, her back was grossly normal and

Dr. Geise noted she ambulated and transitioned slowly and with back pain.  He

renewed her hydrocodone.  Id.  Ms. Chapman denied unilateral disturbance of

---

[5] Ms. Chapman's last name was previously Lowell, and that name appears
throughout some of the medical records.

motor or sensory function and strength testing of her legs was normal.  Id.  Her upper extremities were completely normal.  Id.  Examination revealed tenderness and stiffness to range of motion ("ROM") maneuvers of the head and neck and diffuse dorsal spine and paraspinous soft tissue tenderness to palpitation.  AR 627.  On December 22, 2011, Ms. Chapman again requested a refill of her hydrocodone and indicated she could not afford the Lyrica her psychologist had prescribed.  She felt she would have enough money to see Dr. Geise after the holidays, and wanted to be tested for fibromyalgia at that time.  AR 586.

Ms. Chapman saw Dr. Geise on January 6, 2012, for chronic back pain and diffuse pains in the arms and legs.  AR 637.  She was seen on January 27, 2012, by another doctor and reported she had been diagnosed with fibromyalgia, but the treatment note stated it did not appear Dr. Geise had given her that diagnosis.  AR 659.  Dr. Geise's exam found pain to the back, arms, and legs with diffuse joint and soft tissue tenderness to palpation and manipulation with no sign of injury.  AR 637.  She was diagnosed with myalgia and myositis.  Blood tests were ordered to look for inflammatory problems, which were not found.  AR 638, 646.  Dr. Geise continued Ms. Chapman on Neurontin, which her psychiatrist had already started for her pain.  AR 637-38.

On January 23, 2012, Ms. Chapman wrote to Dr. Geise and indicated she had received his letter with her test results and probable diagnosis of fibromyalgia.  She told Dr. Geise she was already taking Neurontin, which her psychiatrist, Dr. Fuller, had prescribed for restless leg syndrome, but that had

11

improved, so Dr. Fuller directed her to discuss ongoing medication for her ongoing pain in her legs, arms, wrists, feet and other places with him.  AR 588.

On January 25, 2012, Ms. Chapman emailed Dr. Geise and acknowledged Dr. Geise had said no narcotics.  But after a long night of little sleep even with sleeping pills she again requested a refill on hydrocodone. AR 589.  Ms. Chapman emailed Dr. Geise again later that day, after calling and talking to Jan[6], and said after two days of begging for something for the pain in her legs, the pain was unbearable.  She explained she was unemployed, uninsured, in the process of applying for disability, and could not get in to see Dr. Geise until next month sometime when she could get some money.  She thought it was unfair to allow her to continue to suffer with the pain simply because she couldn't afford to come in.  AR 590.

On March 16, 2012, Ms. Chapman emailed Dr. Geise explaining her neck hurt and she had headaches.  She explained "we" spent last month pulling out floors and walls, installing new walls, floors, carpet, and linoleum and painting in the house that had a slow leak for years.  She stated her main job was painting.  AR 593.

Another of Ms. Chapman's doctors questioned whether Dr. Geise had actually diagnosed her with fibromyalgia (AR 659), but at her next visit with Dr. Geise on March 12, 2012, Dr. Geise listed fibromyalgia first in Ms. Chapman's list of assessed illnesses and he assisted her with obtaining her

---

[6] Janette M. Moller, a LPN in Dr. Geise's office.  AR 590.

fibromyalgia medication (Lyrica--which had been prescribed for her by a physician at Southeastern Behavioral Health) at a reduced cost.   AR 667.

Ms. Chapman saw Dr. Geise again on August 7, 2012, for her fibromyalgia complaining of continued diffuse joint and muscle pain and stiffness and significant swelling in her legs.   AR 692.  She had been unable to tolerate Lyrica due to swelling in her legs and hands (AR 598), and her psychologist recommended a trial of Cymbalta.  Id.  Dr. Geise agreed, prescribed Cymbalta, and completed patient assistance forms for the medication.  AR 693.  She had no swelling, tenderness or synovitis at any joint, and her mental status examination was normal.  AR 692.  On July 31, 2012, Ms. Chapman requested a hydrocodone refill.   AR 597.

On November 5, 2012, Ms. Chapman was seen following abnormal blood tests and was diagnosed with diabetes type II.  AR 716.  She denied any abdominal pain, nausea or vomiting, or change in bowel habits.  Id.  She denied any neurological impairment, disturbance of motor or sensory function, and had no symptoms of joint pain, swelling or back pain.  AR 717.  During a December 3, 2012, follow-up for diabetes and hyperlipdema, Ms. Chapman denied joint pain, swelling, or back pain, and denied any disturbance of motor or sensory function.  AR 728.

On February 4, 2013, during a follow-up examination for her diabetes, Ms. Chapman again denied joint pain or back pain.  AR 935.  She had no active swelling or tenderness of any joint.  Id.

13

During a May 8, 2013, diabetes follow-up, Ms. Chapman said she had been doing well, with no issues or concerns except for loose stool.  AR 1007. Ms. Chapman denied joint pain, swelling, or back pain, and she had no active swelling or tenderness at any joint. AR 1008.

On July 3, 2013, Ms. Chapman wrote that she had a little fall on her motorcycle, was sore everywhere mainly her neck and shoulders, and requested hydrocodone or Percocet. AR 1051.

Ms. Chapman was seen again for chronic pain on July 21, 2013, which had been worse the last couple of months.  AR 1059.  She had been taking Cymbalta and amitriptyline, and reported hydrocodone does give relief.  Id. Dr. Geise felt it was a flare of Ms. Chapman's fibromyalgia and his assessments included arthralgia and body aches.  AR 1059-60.  He noted she ambulated freely.  AR 1059-60.  Her joint examination was normal, with a full range of motion of the spine, shoulders, elbows, wrists, fingers, hips, knees and ankles, and no active swelling or tenderness at any joint.  AR 1059.  Dr. Geise stressed the importance of exercise and warm/cold soaks.  AR 1060.

On July 24, 2013, Ms. Chapman requested hydrocodone or a recommendation for pain she believed was due to gout.  AR 1092.  When told her hydrocodone was to last for another two days, Ms. Chapman emailed back attempting to explain her pain and indicating she wished she could make Dr. Geise feel her pain. She stated "I sit her and bawl half the day . . . I'm frustrated and I hurt and if I have to feel this way the rest of my life, then I don't want it."  AR 1108.

Ms. Chapman was seen again on July 26, 2013, for diffuse body aches
and pains, and elevated uric acid.  AR 1118. Dr. Geise stated she appeared
emotionally distressed discussing her pain and debility, and Dr. Geise's
assessment was hyperuricemia and chronic pain syndrome/fibromyalgia.
AR 1119.  Dr. Geise noted Ms. Chapman ambulated freely, had no red or
swollen joints, no obvious episodes of acute gouty arthritis, and had no soft
tissue nodules.  AR 1118.  A joint examination was normal, with a full range of
motion of the spine, shoulders, elbows, wrists, fingers, hips, knees, and ankles,
and no active swelling at any joint.  Id.  In order to rule out gout or
inflammation, he prescribed indomethacin and a burst of prednisone.
AR 1119.  On July 29, 2013, Ms. Chapman reported she was much improved
on the medication, but was having stomach cramps and diarrhea.  AR 1130,
1138.  Dr. Geise instructed her that the medication should not cause diarrhea
and if it continued they would have to check stool specimens.  Id.  The next day
she reported the cramps and diarrhea had stopped, but she had low back pain.
AR 1147.

Ms. Chapman saw Dr. Geise on August 13, 2013, with reduced pain,
rating her pain and debility at 3 on a scale of 0-10.  She reported problems
with memory loss, weakness in her legs, and falling.  AR 1268.  She reported
significant clearing of her joint and body pains and was very happy with the
improvement.  Id.  She had no visual disturbance, appeared healthy and well,
and ambulated freely.  Id.  Her speech and mentation were clear, joint
examination was normal with no active swelling or tenderness at any joint.  Id.

15

Dr. Geise's assessment was gout and he continued her prednisone.  He also scheduled MRIs due to leg weakness, falls, and memory loss.  AR 1268-69. The brain MRI, while grossly stable to the prior MRI in 2008, did reveal nonspecific punctate foci of T2 and FLAIR hyperintensity, which indicated some small vessel ischemic changes.  AR 1271, 1339.  Dr. Geise referred Ms. Chapman to Great Plains Psych for testing related to her memory loss, but she was unable to afford the referral.  AR 1431.

Ms. Chapman saw Dr. Geise again on October 9, 2013, for body pains and leg weakness with falling.  AR1271.  She reported her body pains had returned with the indomethacin providing no relief, and when switched to Mobic, she still saw no pain relief.  AR 1271, 1441-42.  Ms. Chapman requested hydrocodone, but Dr. Geise refused to prescribe it.  AR 1271.  She continued to report episodes of weakness in her legs resulting in falls and Dr. Geise referred her to the neurology clinic.  Id.  Ms. Chapman reported on September 30, 2013, that she had fallen four times in the last two months. AR 1438.  Dr. Geise noted she ambulated slowly and deliberately and was emotionally distressed.  He repeated the inflammatory tests, tried another burst of prednisone, and referred her to the rheumatology clinic, but her joint and mental status examination were normal, and she denied back or joint pain.  AR 1271.

Ms. Chapman saw Dr. Geise on October 24, 2013, after fall which resulted in a hospitalization for head contusions and a left wrist injury. AR 1274, 1458.  Ms. Chapman had been hospitalized from October 15, 2013,

16

to October 17, 2013.  AR 1305.  Her hospital discharge diagnoses included orthostatic hypotension, and she was started on Florinef.  AR 1310, 1314.  On discharge, neurological exam showed her strength and sensation were grossly intact.  AR 1311.  Her admission physical back exam showed found "full range of motion, no tenderness, palpable spasm or pain on motion."  AR 1318.  She reported being less light headed with Florinef and had no further near syncope or falls, but was still having post-concussion syndrome with headaches, light headedness, fatigue, and slowing of mentation.  AR 1274.  Her mental status examination was normal and there were no obvious signs of distress or discomfort.  Id.  She was taking hydrocodone for her pain, and fibromyalgia and pain management were discussed.  Id.

Four days later Ms. Chapman requested a refill of hydrocodone at a higher dosage, indicating it would last longer.  AR 1471.  On November 1, 2013, she requested another prescription because the weekend was coming up and she had fallen down slippery steep stairs since last seeing Dr. Geise. AR 1474.  Dr. Geise authorized a prescription at one dose every eight hours; however, the pharmacist informed Dr. Geise's clinic she was taking five a day. AR 1475.  Ms. Chapman continued to have severe muscle and body aches and reported on November 20, 2013, that her pain leaves her curled up in a fetal position daily, she had been crying every day, and felt depressed beyond words. AR 1479.  Later that day she requested "a little something for pain."  AR 1480. Nine days later she requested additional hydrocodone.  AR 1482.  On

December 3, 2013, Ms. Chapman again requested hydrocodone, indicating she was taking one or two a day.  AR 1486.

Ms. Chapman saw Dr. Geise on January 2, 2014, following her rheumatology consult, where her fibromyalgia diagnosis was confirmed. AR 1277.  She reported her only pain relief came from hydrocodone, but realized it was recommended to avoid narcotics with fibromyalgia.  Id. Dr. Geise increased her dosage of Cymbalta, gave her 20 hydrocodone pills, but told her no more; and referred her to Jodi Williams, LPCMH, a therapist who assisted patients with chronic health issues.  AR 1277, 1517-18. Ms. Chapman's neurological, extremity, and mental status examination were normal.  AR 1278.

On February 2, 2014, Dr. Geise informed Ms. Chapman he could not replace the Clonazepam she claimed she'd lost.  Dr. Geise explained he did not replace lost or stolen prescriptions, and in any event the prescription needed to go through her prescribing psychiatrist.  AR 1520.

On February 5, 2014, Ms. Chapman asked Dr. Geise for something to help with aches and pains.  AR 1521.  She reported Cymbalta was working great for her fibromyalgia.  Id.  Dr. Geise responded she should find a fibromyalgia clinic or treatment center.  AR 1524.  Two days later, Ms. Chapman explained hydrocodone and a muscle relaxer had helped her husband, and she wanted to get relief from her back pain, not to get high. AR 1525.  Dr. Geise noted Ms. Chapman had received 10 hydrocodone from

18

acute care.  Ms. Chapman said she took two at a time because they were a

weaker dosage, and they did not help much.  AR 1530.[7]

When Ms. Chapman saw Dr. Geise on June 11, 2014, to follow up on her

diabetes she also reported neck pain and muscle contracture headaches.

AR 1540.  She had no active swelling, tenderness, or synovitis at any joint.  Id.

Her sensory examination was normal.  Id.

On June 18, 2014, Ms. Chapman complained of chest pain and

shortness of breath.  AR 1559.  She also reported fatigue and low back pain

radiating down her legs.  She also reported recent upper back pain and pain

---

[7] Many of these communications between Ms. Chapman and Dr. Geise did not
occur during normal office visits but instead were via Sanford's "MYCHART"
program.

My Sanford Chart
My Sanford Chart allows you secure online access to your personal health
information and your child's health information. It's available any time of the
day, anywhere you have internet access. There is no cost to you and registering
is quick and simple.
Reasons to choose My Sanford Chart:
Access your online medical record
Schedule appointments online
Access your test results
Request prescription renewals
Message your care team
Urgent Medical Matters
For medical emergencies - dial 911. My Sanford Chart is not for urgent medical
matters. Anything that requires immediate attention should be directed to your
physician over the phone.
Your secure, online health connection
Your health is important to you around the clock—not just during office hours.
That's why Sanford Health offers My Sanford Chart. With this Internet
connection to your doctor's office, you can schedule appointments, request
prescription renewals, review your health history and more—online, any time!

See:  https://www.mysanfordchart.org/MyChart/ (last checked November 22,
2016).

19

radiating down her left arm, but she denied those symptoms were present at the examination.  AR 1560.  Dr. Geise concluded the chest pain was likely caused by reflux.  Id.  Ms. Chapman admitted stopping Prevastatin a couple of years ago and agreed to resume taking it.  AR 1559-60.  A joint examination was normal.  Id.  On June 25, 2014, she returned for abdominal pain and concern of having Celiac disease.  AR 1579.  She continued to have chronic pain, but felt it was stable, and had no more reflux.  Id.

Ms. Chapman saw Dr. Geise on September 2, 2014, after a fall.  AR 32. She reported ongoing pain in her back, right wrist, and right leg with difficulty sleeping and requested hydrocodone to take at bedtime.  Id.  Dr. Geise noted she appeared uncomfortable and ambulated and transitioned very slowly, and he observed mild bruising on the lower back and right lower leg, with some mild swelling in her right wrist, but she had a full range of motion of the right knee and right wrist.  AR 33.  She was given a toradol injection and prescribed hydrocodone.  Id.

On September 22, 2014, Ms. Chapman reported "head to toe aching" for the last two weeks with pounding headache and stomachache on some days. AR 46.  Dr. Geise noted he didn't have much to offer for her chronic pain because she had pretty much tried everything.  AR 46-47.

On September 30, 2014, Ms. Chapman reported diarrhea, but denied swelling, numbness, tingling, or weakness in the extremities.  AR 50.  She denied symptoms of neurological impairments or unilateral disturbance of motor or sensory function.  Id.  She had no loss of balance or vertigo.  Id.

20

Ms. Chapman saw Dr. Geise on October 23, 2014, to follow up with ongoing problems with diarrhea and abdominal discomfort.  AR 73.  All test results were negative and Dr. Geise suspected IBS.  AR 75.  She denied swelling, numbness, tingling, or weakness in the extremities.  AR 74.  She denied symptoms of neurological impairment.  Id.  She had no pain, swelling, or difficulty or restriction in movement of her wrists.  Id.  She had no swelling, tenderness, or synovitis of any joints.  AR 75.

On December 23, 2014, Ms. Chapman reported having a cough and requested prescription cough syrup.  AR 96.  Ms. Chapman received a prescription that same date but emailed Dr. Geise six days later reporting she was out of the cough syrup with codeine.  AR 97.   On January 13, 2015, she reported her cough was still present and received another prescription for cough syrup with codeine.  AR 102.

Ms. Chapman saw Dr. Geise on January 15, 2015, complaining of bilateral hip pain after twisting and stretching in bed that morning, and suddenly feeling a pulling in both lateral hips.  AR 120.  Dr. Geise noted she walked with a narrow-based shuffling gait, and that she was brought to the exam room in a wheelchair.  Id.  X-rays of her hip and pelvis were unremarkable, (AR168), and Dr. Geise's assessment was bilateral hip pain, strain, and tendonitis.  AR 121.  Her hips appeared grossly normal and she had a good range of motion.  AR 120.  Neurovascular and strength testing was normal.  Id.  A joint examination was normal.  AR 121.  She was given ketorolac injections and prescribed range of motion and strengthening

21

exercises.  Id. On January 22, 2015, Ms. Chapman requested another refill of her cough syrup with codeine.  AR 135.  Dr. Geise said he would not refill the prescription because he had recently prescribed her hydrocodone and did not want to prescribe two narcotics.  AR 135.  She returned on January 27, 2015, and denied joint pain, swelling, or back pain. AR 145.

On January 28, 2015, Ms. Chapman contacted Dr. Geise regarding issues with tremors, muscle tics and spasms.  AR 160.  Her psychiatrist felt these symptoms may be related to her medications, but indicated the medications were only a possible cause.  AR 160.  Dr. Geise referred her to the neurology clinic.  Id.  Ms. Chapman requested Dr. Geise document her request for a referral to cover her bases for disability.  Id.

On February 2, 2015, Dr. Geise contacted Ms. Chapman regarding elevated HgbA1c and told her to make an appointment to be seen.  AR 161, 173.  On February 3, 2015, Dr. Geise completed a Medical Source Statement regarding Ms. Chapman's work limitations if she were to attempt full-time work.  AR 1364-68.  Dr. Geise checked boxes indicating he agreed Ms. Chapman had not been working since September, 2011.  He further agreed if she attempted full-time work it was likely her symptoms would increase, and she would be limited more than her treatment notes indicated during periods when she was not working.  AR 1364.

Dr. Geise checked boxes in the Medical Source Statement indicating he felt Ms. Chapman was not limited in her sitting ability, but would be limited to standing or walking significantly less than 6 hours of an 8-hour workday,

22

could only occasionally lift 10 pounds or less, and never lift 20 pounds; could rarely twist, and never do work which required repetitive fingering, handling, or reaching.  AR 1365.  Dr. Geise noted significant neck limitations, checking boxes indicating he believed Ms. Chapman could never do work that required looking down, up, right, or left and sustaining flexion of the neck.  AR 1366.  Dr. Geise noted Ms. Chapman's medications cause further limitations, including "slowing, clouding of mentation, fatigue," and checked a box indicating he believed if she attempted full-time sustained work she would likely have ongoing absences in excess of two days per month.  Id.  He also checked boxes indicating he believed if she attempted full-time work her ability to sustain pace or concentration would decline due to pain or other symptoms to the point where she would be functioning at 75% or less of normal pace by the last two hours of each day, and her pain and symptoms would interfere with her ability to sustain pace, concentration or attention to the degree that she would routinely be off-task 10% of the time or more.  AR 1367.

Dr. Geise checked a box indicating he believed Ms. Chapman's mental impairments would limit her further, listing bipolar disorder, depression, anxiety, and post-traumatic stress disorder ("PTSD").  He checked boxes indicating he believed these mental impairments would substantially limit her ability to meet the basic mental demands of work, including understanding and carrying out simple instructions, making simple work-related decisions, responding to supervision, co-workers and work situations appropriately, and dealing with changes in a work setting.  AR 1367-68.  He then listed bipolar

23

disorder, depression, anxiety, PTSD, muscle spasms, twitches of the arms and hands, headaches, neck pain and stiffness, and balance problems as the impairments that contributed to those limitations.  AR 1368.   Dr. Geise checked a box indicating he believed Ms. Chapman had been limited to this degree since September 26, 2011.  AR 1368.

### 2.    Sanford Rheumatology Clinic

Dr. Geise referred Ms. Chapman to the rheumatology clinic and she was seen on December 31, 2013.  AR 1369.  The musculoskeletal exam was positive for diffuse "soft tissue ttp"[8] in both axial and peripheral distribution, but negative for synovitis in the upper and lower extremities.  AR 1374.  She also had a full active and passive range of motion of the lower extremities and cervical spine.  Id.  The diagnoses included knee pain, arthralgia, obesity, fibromyalgia, and depression.  AR 1375-76.  The rheumatologist's assessment stated that the exam showed diffuse soft tissue ttp, strongly suggestive of fibromyalgia.  AR 1376.  He noted Ms. Chapman's chronic narcotic pain use and application for disability.  Id.  The rheumatologist stated he did not clearly identify any inflammatory arthritis in Ms. Chapman's presentation, and ordered additional blood tests, which were negative for rheumatoid arthritis.  AR 1376, 1389.  The rheumatologist told Ms. Chapman he did not recommend narcotic pain medication for fibromyalgia, and advised increasing her Cymbalta

---

[8] It appears that in this context, soft tissue ttp means "tenderness to palpation."  http://acronyms.thefreedictionary.com/Tenderness+to+Palpation (last checked December 16, 2016).

dosage.  AR 1376.  He advised increasing exercise, improving sleep, massage, and acupuncture.  Id.

On January 3, 2014, the rheumatologist ordered an MRI of Ms. Chapman's knee to look for joint inflammation, which would help to definitively determine if there was anything other than the fibromyalgia causing her knee pain.  AR 1389.  The MRI did not show signs of joint inflammation, but did show early changes of knee osteoarthritis or age-related arthritis. AR1397, 1402-03.

### 3.   **Sanford Cardiovascular Institute**

Ms. Chapman experienced abdominal pain and was diagnosed with a cyst on her left ovary at Sanford Hospital on December 29, 2012.  AR 828. Ms. Chapman then saw Dr. Shipper at the Sanford Women's Clinic, who scheduled surgery and referred her for preoperative surgical clearance. AR 742-43.

Ms. Chapman was referred for a preoperative clearance for upcoming ovary removal surgery with a history of chest pain on January 16, 2013. AR 845.  Ms. Chapman reported shortness of breath with activity such as one flight of stairs, chest pain with a history of arrhythmias—palpitations once per week, pounding up to 30 minutes with dizziness.  AR 848.  She had no musculoskeletal tenderness, had normal motor skills, and was alert and fully oriented.  AR 849.  Ms. Chapman had previously been treated at Sanford Hospital for palpitations on October 28, 2012.  AR 835.  She also reported a history of heartburn, nausea, vomiting, abdominal pain, diarrhea and

constipation.  She had depression and was observed to be nervous/anxious.
AR 848-49.

Cardiac testing was done, including a nuclear stress test, which showed
no cardiac findings, but was stopped after five minutes and 50 seconds due to
dyspnea.[9]  AR 914.  A 30-day cardiac event monitor revealed PVCs[10], and it
appeared medication was prescribed.  AR 880, 918.  Ms. Chapman was cleared
for surgery.  AR 869. Due to insurance concerns, the ovary surgery was
delayed in favor of observing with follow-up ultrasound.  The surgery was later
completed on March 28, 2013, at Sanford Hospital.  AR 754, 777, 793.

Ms. Chapman saw Dr. Adam Stys on June 5, 2013, complaining of
palpitations with dizziness, malaise/fatigue, nausea, shortness of breath and
weakness.  AR 877.  She reported fatigue and chronic dyspnea on exertion
within 1-2 blocks, palpitations and leg swelling.  AR 881.  She also reported
neck and shoulder pain, and she had been to the emergency room on May 31,
2013, due to dizziness and palpitations.  AR 881, 1342.  Ms. Chapman had
normal motor skills, a supple neck, and no abdominal tenderness.  AR 881.
Ms. Chapman's Imdur was discontinued and Metoprolol was added.  AR 882,
889.

On July 2, 2013, Ms. Chapman reported having very painful aching in
her joints, muscles, neck and shoulders, and she stated hydrocodone or

---

[9] Shortness of breath.  http://www.mayoclinic.org/symptoms/shortness-of-breath/basics/definition/sym-20050890 (last checked December 16, 2016.)

[10] Premature ventricular contractions.  http://www.mayoclinic.org/diseases-conditions/premature-ventricular-contractions/basics/definition/con-20030205 (last checked December 16, 2016.)

Percocet worked well for her.  AR 893, 902.  Ms. Chapman was given the option of changing the Metoprolol to another medication in case this was a side effect of the mediation.  Id.

### 4.   Sanford Medical Center

Ms. Chapman reported palpitations on October 28, 2012.  AR 835.  She was negative for leg swelling, nausea, and vomiting.  AR 836.  She had a normal musculoskeletal range of motion and was told to reduce caffeine use and take a daily baby aspirin.  AR 836-37.

On November 26, 2012, Ms. Chapman reported she was trying to exercise daily by walking her dogs.  AR832.  Her exercise plan was to walk the dogs 15 to 20 minutes each day.  AR 831.

Ms. Chapman reported to the emergency room on December 28, 2012, with complaints of pain over her left hip bone.  AR 821.  The social history portion of the note states, "She reports that she uses illicit drugs (Prescription)."  AR 822.  She received morphine, which improved her pain.  AR 823.

### 5.   Avera McKennan Hospital

The earliest medical records in the appeal record related to Ms. Chapman's mental health are related to a 24-hour mental health hold on May 31, 2009, following a verbal fight with her boyfriend, when she took a knife and tried cutting herself and threatened suicide by overdose.  AR 1220-21.  Ms. Chapman stated that, to save money, she had cut the amount of medication in ¼ to make it last longer.  She said she had been

27

drinking alcohol at a bachelorette party before accusing her boyfriend of things she knew he did not do.  AR 1239.  Her admitting diagnoses included bipolar type 2, depressed, anxiety disorder, alcohol dependence, and history of methamphetamine dependence in remission.  AR 1220.  She had fair insight, was fully oriented, and her thought content was within normal limits. AR 1237.  She had normal strength, intact sensation, and a stable gait. AR 1229.  Her memory, attention, and concentration were normal, and she was cooperative with fair eye contact.  AR 1228.  She claimed auditory hallucinations sometimes, particularly if she did not take her medications. AR 1228, 1237.  Ms. Chapman's mood was dysthymic and anxious, her affect was restricted and congruent with her mood, and her insight and judgment was "likely poor."  AR 1228.  Ms. Chapman's primary care physician was Dr. Geise and she received mental health treatment at Sanford Behavioral Health.  AR 1221.

Ms. Chapman was again admitted on a 24-hour mental health hold on July 22, 2009.  AR 1243.  She was placed on hold following an incident with her boyfriend where she began to drink, became upset, and made a minor cut on her wrist.  Id.  She noted she had recently got a job at Pilot, and after being there only a week, she had the opportunity to possibly move into a management position.  AR 1244.  She stated her attention and concentration are okay when she is on her medicine.  AR 1243.  She said she does foolish things when she drinks.  Id.  She reported having a good relationship with her

19-year old child.  AR 1244.  During a brief physical examination, no gait abnormalities were observed.  Id.

Ms. Chapman was seen on May 21, 2010, related to a domestic abuse incident in which she was struck in the head.  AR 1197.  A CT scan of the cervical spine showed no fracture or subluxation, but she did have a left orbital fracture.  AR 1198, 1201.  The cervical CT did reveal mild to moderate degenerative changes, specifically hypertrophic facet joint degeneration was present at C2-3 with mild foraminal stenosis, and degenerative disc related endplate changes, marginal osteophytes and uncovertebral joint degeneration were present at C5-C6, and mild spinal canal stenosis with moderate biforaminal steroids.  AR 1202-05.

Ms. Chapman was admitted for another 24-hour mental health hold on July 26, 2012.  AR 1167.  She was initially taken to the Avera Heart Hospital, but then transferred to Avera Behavioral Health.  AR 530, 532.  The hold followed an altercation with her husband, which led to Ms. Chapman drinking and then verbalizing suicidal intentions and self-inflicted cutting.  AR 1170, 1180.  She denied suicidal ideation on the night in question and had made a small superficial cut on her arm.  AR 1180.  She said this was to ease her pain but was not a serious suicide attempt.  Id.  Ms. Chapman reported decreased energy and concentration, increased appetite, increased anxiety, and had been anxious about leaving the house and being around big groups of people.  Id.  She reported that she had not had any full blown manic episodes since being diagnosed with bipolar and starting medication, but she did report continuing

29

to hear voices.  Id.  She had a history of alcohol and methamphetamine abuse, including drinking 10 mixed drinks the previous week.  AR 1181.  She was worried about accurately disclosing her alcohol intake because she thought it would negatively affect her attempt to get disability benefits.  Id.

Ms. Chapman's diagnoses included bipolar I disorder, adjustment disorder with depressed mood, social anxiety disorder, borderline personality disorder traits, GERD, fibromyalgia, and IBS.  AR1167.  On examination she had no tremors and her eye contact was appropriate during parts of the interview and downcast during other parts of the interview. AR 1183.  Under "Attitude" the record stated "[t]he patient is somewhat guarded due to being on a South Dakota hold.  She is also defensive about her alcohol use and minimized this. Mood is 'tired.'  Affect is restricted and irritable."  Id.  Her thought process was logical and oriented.  AR1184.  She had poor insight and impaired judgment, but her memory was intact and concentration and attention span were fair.  Id. Physically she had an intact gait and motor strength.  AR 1185.

### 6.   Southeastern Behavioral Health – Psychiatrist Records

The earliest psychiatrist treatment note in the appeal record is an exam when Ms. Chapman was seen at Southeastern Behavioral Health on June 23, 2011, by a resident psychiatrist and psychiatrist William Fuller, MD. AR 555-58.  The earlier treatment records at Sanford Behavioral Health, referenced in the hospital records, do not appear in the appeal record. AR 555, 1221.  Ms. Chapman scheduled an appointment to establish care for her bipolar disorder and personality disorder, and had been off of medications

for two months.  AR 555.  She reported depressed mood, poor sleep,
exhaustion, anhedonia, depression, and some negative self-talk, but no
suicidal thoughts.  Id.  She reported her last manic event took place about six
months earlier and coincided with a relapse into gambling and alcohol use.  Id.
Ms. Chapman said she had not used methamphetamines in the past year.  Id.
She reported being severely abused by several of her husbands, and that she
has a very strong psychological response to memories of the abuse.  AR 556.
She was pleasant, cooperative, and maintained good eye contact.  AR 557.  She
had no evidence of tics or tremors and had an average estimated IQ.  Id.  On
her mental status examination, she scored eight out of eight on orientation,
seven out of eight on attention, four out of four on immediate recall, four out of
four on calculations, four out of four on fund of knowledge, three out of four on
delayed recall, and three out of three on abstractions.  Id.  She had fair insight
and judgment.  Id.  She was attempting to get disability for her bipolar
disorder, which the psychiatrist stated "appears reasonable [illegible] level of
impairment."  Id.  The psychiatrist's impressions included bipolar type I, PTSD,
generalized anxiety disorder, cluster B traits, and her GAF was assessed at 45,
but she seemed to be functioning fairly well with the exception of the
exacerbation of her depression since being off her mediations.  Id.
Ms. Chapman was restarted on Seroquel via the patient assistance program,
clonazepam, Zubac, citalopram, Celexa, and Remeron.  Id.

    Ms. Chapman saw her psychiatrist again on September 29, 2011.
AR 552-53.   Ms. Chapman reported that she was working and enjoyed her

work at a call center, but had gone from full-time to part-time, she was on probation for calling in sick, and could only miss one more day without losing her job.  Id.  She reported losing a full bottle of clonazepam at work and having increased anxiety, but was told she could get one refill for lost pills.  AR 553. She reported weight gain, and the doctor felt this could be due to her medication and discussed changing her to a less sedating medication.  Id. Ms. Chapman reported doing okay and feeling stable, but she had a tendency to pull within herself and this caused suicidal ideation and focus on negative thoughts.  Id.  Her mood was sad and anxious, affect was restricted, stable and congruent and she was alert with grossly intact memory and good judgment and insight.  Id.  She was encouraged to follow up with individual counseling, her anxiety medication was changed, and her GAF was assessed at 40. AR 553-54.

Ms. Chapman saw her psychiatrist on January 23, 2012, and since her prior appointment she had been changed back to clonazepam and her Remeron dosage was increased, but she later stopped it because it was not helping her sleep and she thought it was causing restless leg syndrome and leg pain AR 549.  A trial of Lyrica had been prescribed, but she could not afford it, then her Seroquel was changed to an immediate release form, but she was waiting on patient assistance, and a trial of Flexeril and gabapentin were prescribed. Id. Ms. Chapman saw a different resident psychiatrist, but Dr. Fuller continued to supervise her care, and Ms. Chapman reported she had been diagnosed with fibromyalgia and was having reduced energy and concentration and a lot of

passive suicidal thoughts.  Id.  Ms. Chapman reported she was no longer working and had stopped her part-time job at the call center after two months because she became more and more anxious at work, not able to function, and this was a consistent pattern for her.  AR 550.  Her grooming and eye contact were fair, mood anxious, affect minimally restricted, attention and concentration intact, and insight and judgment overall intact.  Id. The psychiatrist increased Ms. Chapman's clonazepam dosage instructed her to continue with her individual counseling with Ann Mack and case management with Jenny Basche; her GAF was assessed at 52.  AR 548-49.

Ms. Chapman saw the psychiatrist on July 30, 2012, following two recent hospitalizations for 24-hour mental health holds at Avera Behavioral Health.  AR 546.  Ms. Chapman reported her mood had been up and down and tended to change minute to minute, that she had anxiety over her recent marriage, and some concentration problems that she blamed on a side effect of Lyrica.  Id.  She reported her last hypomanic event had occurred about two months earlier, but she was now depressed, having problems with relationships, felt abandoned, and was having mood fluctuations.  Id.  She reported she had been working with her therapist Ann since her discharge from the hospital.  Id.   Her doctor added "[r]ule out borderline personality order"  to the assessments, increased her Celexa, continued her other medications,  and recommended that she discuss stopping Lyrica and starting a trial of Cymbalta for her fibromyalgia pain with her primary care physician.  Id.  The psychiatrist assessed Ms. Chapman's GAF at 55, and instructed her to continue therapy

33

with Ann and case management with Jenny.  AR 545-46.  She had fair insight and judgment and fair to good attention and concentration.  AR 546.

Ms. Chapman saw her psychiatrist again on September 10, 2012, and reported she had discontinued her Lyrica and her primary care provider no longer gave her hydrocodone, which resulted in increased fibromyalgia pain and increased depression.  AR 543.  She had started on Cymbalta, but had not noticed any effect yet.  Id.  Her GAF was assessed at 55-60, and her Cymbalta dosage was increased.  AR 542-43.  She felt things were going well for her new husband and felt good after visiting a friend.  AR 543.  She denied losing interest in watching television, visiting with her husband or with a friend.  Id.  She was cooperative and pleasant and had fair insight and judgment and fair to good attention and concentration.  Id.

Ms. Chapman saw the psychiatrist on December 10, 2012, and she reported doing "pretty good" with the increased Cymbalta dosage greatly helping with her mood and fibromyalgia pain.  AR 540.  She also reported increased anxiety especially is social situations, and was having some panic attacks.  Id. Her medications were continued, except her clonazepam was increased to allow one additional pill as needed for breakthrough anxiety.  Id.  She had fair to good insight, judgment, attention and concentration.  Id.

Ms. Chapman returned on March 11, 2013, and reported her mood had been okay, but she had been diagnosed with an ovarian tumor requiring surgery.  AR 932.  She reported receiving support from her mother and that she had been in close contact with her counselor, Ann.  Id.  Ms. Chapman

34

reported ongoing anxiety when she went out in public, but she was able to run errands such as going to the grocery store, otherwise she did not like leaving her house.  Id.  The assessment stated her mood appeared stable except for some increased anxiety regarding her tumor, and her medications were continued unchanged.  Id.  She was writing a book.  Id.  Ms. Chapman's insight, judgment, attention and concentration were fair to good.  Id.

Ms. Chapman returned on May 13, 2013, and reported she was starting a part-time job as a janitor, but was worried it might increase her fibromyalgia pain.  AR 929.  She said she had been worrying about the job a lot, and was having a hard time focusing and was experiencing increased panic attacks.  Id.  She reported being denied for disability five times.  Id.  She had been continuing to work with her therapist, Ann, on her anxiety.  Id.  Ms. Chapman's concentration and focus were down, and she was observed to be easily distractible, and easily got off topic.  Id.  She reported some mild hallucinations, and hearing people talking when it was quiet.  Id.  Her assessment was increased anxiety which triggered irritability and poor concentration along with mild depression due to the recent death of a friend.  Id.  Ms. Chapman was given the option to increase her Seroquel dosage, but declined due to restless leg symptoms in the past, so a trial of Tenex was started with a plan to apply for patient assistance for Intuniv, and then discontinue the Tenex.  Id.  Her insight, judgment, attention and concentration were fair.  Id.

35

Ms. Chapman returned on December 30, 2013, and said both Intuniv and Tenex had been stopped, but was unsure when they were stopped, and reported having significant memory problems.  AR 1283.  Ms. Chapman was tested by MOCA, a rapid screening testing for mild cognitive deficits (*see* http://www.dementia-assessment.com.au/cognitive/MoCA-Instructions-English.pdf).  She had significant deficits, but had already been referred for neuropsych testing by her primary care physician.  AR 1285.  Her gait, tone, and muscle strength were within normal limits.  AR 1284.

Ms. Chapman returned on February 3, 2014, complaining of sleep issues, variable mood, being depressed about 10 days per month, about 4 days at a time, and continued anxiety about going places.  AR 1279.  Her Vistaril dosage was increased and her other medications continued.  AR 1281.  Her assessment at that time included unspecified personality disorder with Cluster B traits, bipolar II currently mildly depressed, generalized anxiety disorder, GERD, orthostatic hypotension, IBS, fibromyalgia, asthma, obesity, diabetes, and differential diagnoses of PTSD, social anxiety disorder, and unspecified neurocognitive disorder.  AR 1280-81.  Her muscle strength, tone, gait and station were within normal limits.  AR 1280.

Ms. Chapman returned on April 7, 2014, complaining of continued struggle with depressed bipolar mood and anxious mood.  AR 1606.  She had seen a therapist in the past and recently started again.  Id.  She denied acute musculoskeletal or immunologic symptoms.  AR 1607.  She was pleasant and cooperative, and had fair attention and concentration.  Id.  Her muscle

strength, tone, and gait were within normal limits.  Id.  BuSpar and Trazodone were added, and Amitriptyline and Vistaril were stopped.  AR 1608.

Ms. Chapman returned on June 2, 2014, and reported a number of stressors were leading to an increase in her bipolar depressed mood, and she had a recent hypomania episode, which lasted about two days.  AR 1601.  She had stopped taking Trazodone and BuSpar.  Id.

Ms. Chapman returned on August 11, 2014, and reported doing fairly well, but had no significant improvement in functioning over the last several months.  AR 186.  She reported being unemployed since 2011 because she is too anxious or disorganized with poor memory to be able to get a new job, and reported having over 60 jobs throughout her life with the most recent one being a hotel maid.  Id.  She noted she worked for 16 years as a cosmetologist but quit when she got tired of it.  Id.  She did talk about trying to get disability and had hired a big lawyer.  Id.  Ms. Chapman reported feeling so well lately, but every once in a while having a day when she feels horrible, and described symptoms which the doctor felt sounded very similar to withdrawal or discontinuation syndrome, so the importance of medication compliance was stressed.  Id.  Her medications were continued unchanged.  AR 187.  Ms. Chapman admitted that she occasionally forgot to take her nighttime medication.  AR 186.  She reported sleeping fairly well most nights.  AR 187.  She had a normal gait, fair to good attention and concentration, and fair to good insight and judgment.  Id.

Ms. Chapman saw her psychiatrist on December 29, 2014, and reported doing quite well lately.  AR 184.  She had experienced a fall a couple of months earlier due to her orthostatic hypotension, and the possible effect of some of her medications was discussed.  Id.  She also reported ongoing weight gain that she attributed to the Seroquel medication, which was exacerbating her diabetes.  Id.  She reported her anxiety remained somewhat increased with that appointment being the first time she had left her house that week.  Id.  Her energy and concentration were good.  Id.  Due to her weight gain, her medications were changed to stop Seroquel and start Latuda.  Id.  Her station and gait were within normal limits and she was calm, cooperative, and pleasant with fair to good eye contact.  Her insight and judgment were good and attention and concentration were fair to good.  Id.

**7.    Southeastern Behavioral Health – Case Management Records**

Ms. Chapman began working with a case manager at Southeastern Behavioral Health on March 11, 2011 (Exhibit A-52). [11]  The case management records from March 11, 2011, to May 2, 2013, were submitted to the Appeals Council, but were not considered and not included in the transcript.  AR 2, 5.  Ms. Chapman began receiving assistance from Jenny Basche, "Jenny" (Exhibit A-53).  She had a normal rate, tone and volume of speech (Exhibit A-52).  She was calm and cooperative, with a fair and congruent mood and logical and

---

[11] This and the bracketed references that follow appear to be references to the "Exhibit A" that was supposed to be but was not attached to the parties' stipulated facts, Docket 11.

goal-directed thoughts.  Id.  She had fair eye contact, insight and judgment.
Id.  She appeared to have several positive aspects in her life.  Id.

Ms. Chapman met again with Jenny on April 8, 2011, to continue
working on goals for her treatment or assistance (Exhibit A-50).  Ms. Chapman
had been isolating herself due to depression, and counseling therapy was
recommended.  Id.  She was on time, calm and cooperative, and had a fair
mood.  Id.  Her insight and judgment were fair.  Id.  She felt isolating herself
was somewhat of a benefit because it kept her away from friends and the
alcohol/drug lifestyle she had in her past.  Id.

Ms. Chapman saw Jenny again on April 15, 2011, and completed a
therapy referral to see a counselor at Southeast Behavioral Health (Exhibit A-
49).  She was on time, calm and cooperative.  Id.  She had no psychomotor
issues and had fair judgment and insight.  Id.  Regarding her isolation, she
reported that an ex-boyfriend, with whom she had used a lot of drugs and
alcohol, wanted to stay with her but she did not want to get involved.  Id.

Ms. Chapman saw Jenny again on April 22, 2011, and plans were
finalized for case management with a plan to meet every two to three weeks.
(Exhibit A-47).  Ms. Chapman met with Jenny on May 5, 2011, and the notes
indicated that she had begun her counseling therapy (Exhibit A-45).

Ms. Chapman continued meeting with Jenny from May 25, 2011,
through May 2, 2013, with 23 additional appointments documented in the
records submitted to the Appeals Council.  The appointments focused on how
Ms. Chapman was doing, her coping skills to deal with problems and

39

symptoms, and assisting her with problems or issues with her relationships, functioning, and treatment (Exhibit A-1-43).

On August 2, 2011, Ms. Chapman reported having a hard time getting motivated to apply and interview for part-time jobs (Exhibit A-35). Ms. Chapman's meeting with Jenny on August 8, 2011, noted that Ms. Chapman had started a full-time job that day, felt it had gone well, and wasn't sure she would be able to work full-time, but was going to try it (Exhibit A-33).

When Ms. Chapman met with Jenny on September 29, 2011, she had gone to part-time at her job (Exhibit A-30). She reported she did not like the job, that she experienced a lot of anxiety while working, had a hard time being organized, and a hard time providing correct answers for customers. Id. Ms. Chapman said she had not received very much negative feedback from her employer, but she felt she was really struggling with the job. Id. By October 21, 2011, when she saw Jenny she had quit her job (Exhibit A-28). Ms. Chapman reported she couldn't handle the job, felt very scattered and unable to concentrate/focus. Id. She was not sure about looking for a new job. Id.

Ms. Chapman saw Jenny on January 3, 2014, when Jenny came to her home. AR 1291. Ms. Chapman was not in counseling at that time, but was thinking about resuming treatment. Id. She reported experiencing a lot of pain from fibromyalgia, as well as a lot of problems with memory, speech and balance. Id.

On February 13, 2012, Ms. Chapman reported her son admitted to stealing her Klonopin (a/k/a clonazepam) (Exhibit A-20).  On June 27, 2012, Ms. Chapman reported she was writing regularly and would like to find writing and computer jobs (Exhibit A-13).

Ms. Chapman met with Jenny on January 24, 2014, and reported she had stopped taking Klonopin and had started on Vistiril, but she wasn't feeling well.  AR 1289.  Jenny reviewed the orders and discovered Ms. Chapman was supposed to have just reduced the Klonopin dosage not stopped it, and helped her get it restarted at the correct dosage.  Id.

Ms. Chapman saw Jenny on February 3, 2014, and asked which counselor she was assigned to since Ann Mack had left, and was told her new therapist was Annie Freudig.  AR 1288.   Ms. Chapman saw Jenny on March 20, 2014, while she was in the office to see Annie, but no counseling record appears in the appeal record.  AR 1610.  Ms. Chapman expressed a desire to resume regular case management appointments, in addition to her weekly therapy sessions.  Id.

Ms. Chapman saw Jenny on April 28, 2014, and received help with paperwork related to patient assistance for her medications.  AR 1605.  When Ms. Chapman saw Jenny on June 6, 2014, she reported additional relationship problems and said her divorce had been finalized.  AR 1600.  The session notes also indicated Ms. Chapman was waiting for another therapist to be set up for her.  Id.

On November 17, 2014, Ms. Chapman saw Jenny for the last time before switching to a new case manager.  AR 182.  Ms. Chapman reported ongoing digestive problems and Jenny assisted her in rescheduling a doctor's appointment she had missed.  Id.

Ms. Chapman met with Erica Adams, "Erica," on December 16, 2014, who took over her case management.  AR 181.  Ms. Chapman met with Erica again on December 29, 2014, and they discussed Ms. Chapman wanting to work again eventually.  AR 180.  Ms. Chapman said she would be unable to do a job that required multitasking, working with other people, or working in a hospital setting.  Id.

Ms. Chapman saw Erica on January 12, 2015, and reported feeling very manic and had been off her Seroquel for a week.  AR 179.  Erica contacted the nursing department and they were able to obtain Ms. Chapman's Latuda, as well as Cymbalta.  Id.

The last case management treatment note in the appeal record is from January 17, 2015, when Ms. Chapman saw Erica and reported feeling scatter-brained, but not foggy like she used to, that a spot on her lung had been found, and she was having tremors in her hands along with twitches, tics and muscle spasms elsewhere in her body.  AR 177.  Ms. Chapman also reported being concerned about her weight which caused her more depression and anxiety.  Id.

42

### 8.    Southeastern Behavioral Health – Counseling Records

Two treatment notes appear in the appeal record.  Ms. Chapman saw
Ann Mack for counseling on July 5, 2013, and was depressed because she
recently received a DUI.  AR 1295.  She was worried about the impact on her
disability case.  Id.  She was scheduled for another session two weeks later.
AR 1296.

Ms. Chapman saw Ann Mack on September 10, 2013, and reported
having memory problems, additional health problems, and feeling more manic
and irritable.  AR 1293.  She was scheduled for another session the following
week, but no other counseling records appear in the appeal record.  AR 1294.

### 9.    Neuropsychology Consultants Records

Ms. Chapman was referred by Dr. Geise for an assessment of her
cognitive and emotional functioning by Michael McGrath, PhD.  AR 1357.
Dr. McGrath evaluated Ms. Chapman on March 22, 2014, reviewed records,
performed a clinical interview, and administered multiple tests including:
WAIS-IV;[12] WMS-IV;[13] TOPF; [14] TWF;[15] GDS;[16] WCT; Digit Symbol Copy
Subtest; AFT; WCST;[17] Trail Making Test A and B; SNST; and AST tests. [18]  Id.

---

[12] Weschler Adult Intelligence Scale.  See, http://wechslertest.com/ (last
checked November 23, 2016).

[13] Wechsler Memory Scale.  See, http://www.helloq.com/tests/test-
library/wms-iv.html(last checked November 23, 2016).

[14] Test of Premorbid Functioning.  See
http://www.pearsonclinical.co.uk/Psychology/AdultCognitionNeuropsychology
andLanguage/AdultGeneralAbilities/TOPF/TestofPremorbidFunctioning.aspx
(last checked November 23, 2016).

Ms. Chapman drove herself to the evaluation and arrived on time. AR 1357.  She had no obvious physical abnormalities, ambulated independently, and maintained appropriate sitting posture.  Id. Dr. McGrath subjectively estimated her intellect appeared to fall in the normal range, and he noted her eye contact was good and she was cooperative.  Id.  He found good rapport was easily established, and she comprehended input easily and was responsive to interview questions.  Id.  She reported she was scheduled to undergo a hearing for disability benefits.  AR 1358.  Ms. Chapman reported memory difficulties that interfered with her activities, her attention drifted, she had some word-finding difficulties, she forgot what she read, her thinking was "all over the place," she had difficulties making decisions, she experienced numbness in her toes, she denied fine motor problems, and felt her left hand functioning had deteriorated over time.  Id.  She reported having had 68 jobs in her life and was fired from two jobs. Id.  She usually related fairly well to coworkers and had a little problem with supervisors.  Id.

---

[15] Test of Word Finding.  See, http://www.wordfinding.com/assessment.html (last checked November 23, 2016).

[16] Geriatric Depression Scale.  See http://www.apa.org/pi/about/publications/caregivers/practice-settings/assessment/tools/geriatric-depression.aspx (last checked November 23, 2016).

[17] Wisconsin Card Sorting Test (measures abstract thinking and executive function). See http://www4.parinc.com/Products/Product.aspx?ProductID=WCST (last checked November 23, 2016).

[18] The meaning of the acronyms for these tests was not provided in the parties' stipulated facts.  The court provided them, where possible, for assistance to the reader.

Dr. McGrath found the test results were valid and Ms. Chapman obtained a full scale IQ score, ("FSIQ"), of 84, which fell in the uppermost point of the borderline range.  AR 1360.  Ms. Chapman's premorbid FSIQ was 103 which suggested a clinically meaningful decline in basic intellectual functioning based on her demographics.  Id.  Dr. McGrath found her memory functioning was marginal, and represented a clinically meaningful decline from estimated premorbid functioning.  Id.  Ms. Chapman's GDS scale score was markedly elevated, which suggested a marked level of depression.  Id.  Dr. McGrath concluded the pattern of test results suggested a mild neurocognitive disorder secondary to fibromyalgia and recurrent depressive episodes.  Id.  Test results also showed Ms. Chapman's capacity for rote learning and memorization appeared poor, but her ability may be underestimated due to her significant motor slowing.  AR 1361.

Dr. McGrath's diagnoses included other depressive disorder (recurrent episodes of depression), mild neurocognitive disorder secondary to depression and fibromyalgia, and history of Bipolar Affective Disorder, per records. AR 1362.

Dr. McGrath documented the following recommendations:

> She does not appear to need any accommodations at the verbal level.  However, she should be advised to avoid situations that place an emphasis upon "quick thinking" as well as situations requiring her to "multitask."  When more important, novel, and/or complex verbal information is being presented, this should be done at a slowed rate.  Visual input should be supplemented with auditory-verbal input, where possible, hopefully to help compensate for the attention/concentration and memory difficulties.  If particularly important information is being conveyed to her, it would be important to check her

45

comprehension of that input via probe questions.  Particularly
important information to be remembered should be provided to
her at the written level, where possible.  If visual input is used,
it needs to be quite clearly logically organized and it would be
useful to point out the salient aspects of that information.  She
also should be afforded extra time to process visual input.
Where possible, visual information to be remembered should be
augmented with verbal input.

Id.

### 10.    State Agency Assessments

The state agency physical experts evaluated the file at the initial level on
March 29, 2013, and again at the reconsideration level on August 9, 2013.
Both times they found Ms. Chapman had severe impairments including
obesity, fibromyalgia, affective disorders, and anxiety disorders, and non-severe
medically determinable impairments of diabetes and substance addiction
disorder.  AR 303, 317.

The expert at the initial level found Ms. Chapman limited to lifting
20 pounds occasionally, 10 pounds frequently; standing and/or walking, and
sitting 6 hours in an 8-hour workday; occasionally climbing ladders, ropes, and
scaffolds; occasional stooping, kneeling, crouching, and crawling; frequent
climbing ramps/stairs; and must avoid concentrated exposure to hazards.
AR 307.  The expert found no limitations in balancing, handling, fingering,
feeling, visual or communication.  AR 306.

The expert at the reconsideration phase found identical limitations,
except he also found Ms. Chapman had limited hearing in the left ear.
AR 319-20.

The state agency mental health expert at the initial level found Ms. Chapman had mild restrictions of activities of daily living, moderate difficulties maintaining social functioning and maintaining concentration, persistence or pace, and had experienced one or two episodes of decompensation, each of extended duration  AR 304.  The expert considered Listings 12.04, 12.06, and 12.09.  Id.  The expert found Ms. Chapman was moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, and in her ability to sustain an ordinary routine without special supervision.  AR 307.  The expert stated she should be able to perform "simple tasks when her pain is under control." AR 308.  He also stated she had been taking medication, which had been effective in controlling her anxiety.  Id.  The expert found Ms. Chapman was also moderately limited in her ability to interact appropriately with the general public, and stated she would function best in settings that are familiar, routine in nature, and involved limited interaction with the general public.  Id.   The mental health expert at the reconsideration level made essentially identical findings.  AR 317, 322.

**D.     Hearing Testimony**

**1.     Ms. Chapman's Testimony**

Ms. Chapman testified that she was 51 years old, completed high school in 1980, attended vocational school for cosmetology, vocational school for phlebotomy, and a six-week class to become a sleep tech.  AR 247-48.

Ms. Chapman testified she had worked at 68 jobs, and usually the jobs ended because she would have problems processing the work, she would then get frustrated and quit.  AR 250.  She also testified she had been married six times and had a divorce pending.  AR 265.

Ms. Chapman testified that she had been fired twice.  AR 250.

Ms. Chapman testified she was 5'3" tall and weighed 200 pounds. AR 265.  She explained that she used to weigh 150 to 160 pounds, then gained about 70 pounds due to her medications, and then lost some of the weight due to her IBS symptoms.  AR 266.

When asked about her most severe medical problems, she said her bipolar disorder, anxiety, depression, fainting caused by orthostatic hypotension, carpal tunnel syndrome, IBS, and fibromyalgia.  AR 249-50.  She said her lack of focus was the biggest obstacle preventing her from working. AR 257.

Ms. Chapman testified that her "hands don't work."  AR 257.  She said she had carpal tunnel for about 15 years, but it had gotten worse, and her hands get painful when she uses them.  AR 258.  She said she notices it when she cuts her son's hair, she will take a few snips and then have to stop and shake out her hands.  Id.

Ms. Chapman testified that her physician was Dr. Geise, and when asked if he had placed any restrictions on her in the last two years, she said no because she was not working during that time.  AR 262.  When asked if he

advised her not to work, Ms. Chapman noted that she did not feel that she could work.  AR 263.

Ms. Chapman testified she has a terrible memory.  AR 251.  She said she uses a dry erase board to keep track of her appointments and updates it every time she comes home from an appointment.  Id.

Ms. Chapman testified she received treatment for her mental health impairments at Southeastern Behavioral Health where her psychiatrists were residents, so they changed every six months, and she also saw a therapist, Annie Freudig, weekly.  AR 256.

Ms. Chapman testified that her depression and anxiety were up and down and up and down even with her medication.  AR 257.  She said she doesn't leave the house and isolates herself.  Id.  She said her depression and anxiety caused her to miss work when she was working.  AR 258-59.  She explained she would get up for work and start getting ready, and then get overwhelmed and be unable to leave her house.  AR 259.  The ALJ asked her, "I think I originally said, did you ever make up illnesses?" and Ms. Chapman answered, "Oh, yeah.  Like I said, flu, cold, or whatever simply because I didn't want to get – go to work or I couldn't, couldn't leave the house basically.  And I didn't want to say that I can't leave the house and – so, yeah, I'd make stuff up."  Id.

Ms. Chapman testified that she had been a methamphetamine addict, but had not used it in about four years.  AR 260.  She testified she drank

alcohol, but was not an alcoholic, and had last drank in June of the prior year
when she received a DUI.  AR 260-61.

Ms. Chapman testified her roommate did the cooking, because she can't
do much of it and her roommate drove except for short distances of about a
six-block radius.  AR 255-56.

Ms. Chapman testified her mother owned the mobile home she lived in
and pays her bills, and she also gets some help from her roommate.  AR 264.
When asked what medications she was prescribed that she could not afford,
Ms. Chapman was uncertain. AR 268.

### 2.    David Brian Jaques' Testimony

Mr. Jaques testified that he did everything in the house except
Ms. Chapman would clean the kitchen, wipe the counters, do the dishes, and
do light vacuuming.  AR 270.

### 3.    Vocational Expert Testimony

The vocational expert ("VE") testified that an individual with the
limitations described by Ms. Chapman in her testimony would be unable to
perform any of her past work or any other occupation.  AR 274-75, 277.

The ALJ's next hypothetical question was based upon the state agency's
assessment:

> Someone who could occasionally lift and carry 20 pounds,
> frequently ten pounds.  Could stand or walk or sit with normal
> breaks in each posture for about six hours of an eight-hour day.
> Push, pulls unlimited and it's the same resistance as lifting and
> carrying.  From a postural standpoint, frequent climbing of ramps
> or stairs, occasional climbing of ladders, ropes, or scaffolds,
> stooping, kneeling, crouching, or crawling, unlimited balancing.
> There's no manipulative or visual limitations.  They do not describe

communicative limitations in speaking.  They do describe
limitations with the left ear and hearing but they said that there's
no difficulty with the right ear.  And they note the hearing not –
loss is not noted as being problematic.  Environmentally, avoid
concentrated exposure to hazards.  Let's plug in additional
limitations and the ability to make personal, social, and
occupational adjustments in a job setting in the same exhibit on
page 2F.  Assume someone who could understand and remember
and carry out routine tasks.  And the terminology they use is
limited contact with the general public.  And I don't know what
limited is.  I think every one of us in this room could have a
different idea of what that means.  But I'm going to assume that it
means no more than occasional public contact.  If so, putting all of
this together, does this appear to be consistent with the physical
and mental demands of past work?

AR 275-77.  The VE testified the individual would be unable to perform

Ms. Chapman's past work, but could perform the occupations of collator

operator (DOT code 208.685-010), motel house cleaner, (DOT code

323.687-014) , and small parts assembler (DOT code 706.684-022).

AR 276.  When asked if any of the jobs would require good hearing in

both ears, the VE testified that limitation would not affect the ability to

perform the identified occupations.  AR 277.

**E.     Other Evidence**

A work activity report showed work as a temporary customer

service representative from July 1, 2011, to September 26, 2011, that the

job was reduced from full-time to part-time hours, and that

Ms. Chapman reported it ended due to physical and/or mental

conditions.  AR 417-20.  The state agency found unsuccessful work

attempt rules applied to this job.  AR 427.

In a disability report completed by Ms. Chapman she stated she had never been able to hold a job longer than two years, and that when she worked she had above normal absences due to getting overwhelmed and missing work.  AR 447.

In the work history report completed by Ms. Chapman she listed 23 different jobs from 1997 to 2011.  AR 449, 456.

## DISCUSSION

### A.   Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); <u>Minor v. Astrue</u>, 574 F.3d 625, 627 (8th Cir. 2009).  Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Klug v. Weinberger</u>, 514 F.2d 423, 425 (8th Cir. 1975).  "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action."  <u>Scott ex rel. Scott v. Astrue</u>, 529 F.3d 818, 821 (8th Cir. 2008) (internal punctuation altered, citations omitted).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. <u>Minor</u>, 574 F.3d at 627.   The Commissioner's decision may not

be reversed merely because substantial evidence would have supported an opposite decision.  Woolf v. Shalala 3 F.3d 1210, 1213  (8th Cir. 1993); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005).  If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed.  Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993).  "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record."  Mittlestedt v. Apfel, 204 F.3d 847, 851

(8th Cir. 2000)(citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed.  Smith v. Sullivan, 982 F.2d 308, 311

(8th Cir. 1992); 42 U.S.C. § 405(g).  Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed.  Walker v. Apfel, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted).   The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court.  Smith, 982 F.2d at 311.

## B.    Burden of Proof

The plaintiff bears the burden of proof at steps one through four of the five-step inquiry.  Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a).[19] The burden of proof shifts to the Commissioner at step five.  "This shifting of the burden of proof to

---

[19] See footnote 3, supra for a description of the five-step inquiry.

the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting at step five has also been referred to as "not statutory, but . . . a long standing judicial gloss on the Social Security Act." Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987).  Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." Stormo v. Barnhart 377 F.3d 801, 806 (8th Cir. 2004).

## C.    The Parties' Positions

Ms. Chapman asserts the Commissioner erred by finding her not disabled within the meaning of the Social Security Act.  She asserts the Commissioner erred in four ways: (1) the Commissioner failed to properly identify her severe mental impairments; (2) the Commissioner failed to properly evaluate her severe fibromyalgia impairment; (3) the RFC determined by the Commissioner is not supported by substantial evidence; and (4) the Commissioner failed to fully and fairly develop the record.

The Commissioner asserts substantial evidence supports the ALJ's determination that Ms. Chapman was not disabled during the relevant time frame and the decision should be affirmed.

## D.    Analysis

Ms. Chapman's arguments are addressed in turn below:

### 1. Whether the Commissioner properly identified Ms. Chapman's severe mental impairments

In this assignment of error, Ms. Chapman asserts the ALJ should have specifically recognized as a separate and distinct severe medical impairment the cognitive impairment which was identified by Dr. McGrath's testing.  She asserts the ALJ's failure to specifically identify her cognitive impairment as a separate medical impairment likewise negatively impacted the formulation of her RFC.

Ms. Chapman asserts that though the ALJ mentioned Dr. McGrath's findings, he gave short shrift to Dr. McGrath's neuropsychological testing, and the ALJ did not adequately incorporate Dr. McGrath's specific recommendations when formulating her RFC.  In support of her argument, Ms. Chapman also posits that the state agency experts, upon whose opinions the ALJ relied, rendered their opinions *before* Dr. McGrath's testing occurred, so the state agency experts' opinions and the limitations they assigned are incomplete because they do not take into account all the relevant medical evidence.

The Commissioner counters that the ALJ sufficiently considered Dr. McGrath's neuropsychological testing and findings and sufficiently incorporated his suggested recommendations into Ms. Chapman's RFC.  The Commissioner also argues that the ALJ's reliance on the state agency experts' opinions, even though they did not have the benefit of Dr. McGrath's testing and recommendations, was harmless because the ALJ sufficiently incorporated Dr. McGrath's suggestions by limiting Ms. Chapman to "routine" work.

To evaluate this claim, it is necessary to revisit Dr. McGrath's findings and compare them to the statements in the ALJ's written decision: Dr. McGrath determined, based upon his testing and evaluation, that Ms. Chapman had a mild neurocognitive disorder secondary to depression and fibromyalgia. As a result, he recommended the following limitations:

> She does not appear to need any accommodations at the verbal level. However, she should be advised to avoid situations that place an emphasis upon "quick thinking" as well as situations requiring her to "multitask." When more important, novel, and/or complex verbal information is being presented, this should be done at a slowed rate. Visual input should be supplemented with auditory-verbal input, where possible, hopefully to help compensate for the attention/concentration and memory difficulties. If particularly important information is being conveyed to her, it would be important to check her comprehension of that input via probe questions. Particularly important information to be remembered should be provided to her at the written level, where possible. If visual input is used, it needs to be quite clearly logically organized and it would be useful to point out the salient aspects of that information. She also should be afforded extra time to process visual input. Where possible, visual information to be remembered should be augmented with verbal input.

AR 1362.

In his written opinion, the ALJ acknowledged Dr. McGrath's testing and his diagnosis of Ms. Chapman's mild neurocognitive disorder secondary to depression and fibromyalgia. AR 207. He did not, however, specifically identify it as an impairment, either severe or non-severe. Id. To complicate matters further, the ALJ—though he mentioned and seemed to rely upon Dr. McGrath's findings throughout his written decision, did not specifically state what weight, if any, he assigned to Dr. McGrath's test results. AR 207, 209-10.

56

Further, when the ALJ determined Ms. Chapman's mental RFC, he stated her "residual functional capacity for only routine tasks does not appear to conflict with Dr. McGrath's  recommendation for the claimant to avoid 'quick thinking' and situations that require her to 'multi-task.' . . . The record as a whole shows the claimant would be able to sustain routine tasks, as determined by the State agency psychological consultants." AR 213.  In other words, at step four, the ALJ distilled all of Dr. McGrath's eight very specific mental limitations into one: Ms. Chapman can do "routine" work.

"It is the claimant's burden to establish that his impairment or combination of impairments are severe."  Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007).   A severe impairment is defined as one which significantly limits a physical or mental ability to do basic work activities.  20 C.F.R. § 1521. An impairment is not severe, however, if it "amounts to only a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."  Kirby, 500 F.3d at 707.  "If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two."  Id. (citation omitted). The claimant bears the burden of showing a severe impairment significantly limits a physical or mental ability to do basic work activities, "but the burden of a claimant at this stage is not great."  Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001).  Additionally, the impairment must have lasted at least twelve months or be expected to result in death.  See 20 C.F.R. § 404.1509.

The failure to identify a severe impairment at step two is not harmless error but is instead grounds for reversal.  <u>Nicola v. Astrue</u>, 480 F.3d 885, 886-87 (8th Cir. 2007).  In <u>Nicola</u>, (as in this case) the severe impairment the claimant alleged the ALJ failed to identify was borderline intellectual functioning.  <u>Nicola</u>, 480 F.3d at 887.  The Eighth Circuit noted when such a diagnosis is supported by sufficient medical evidence, it should be considered severe.  <u>Id.</u>  The court held the ALJ's failure to identify the impairment as severe was not harmless error.  <u>Id.</u>  The court reversed and remanded the case to the commissioner for further proceedings.  <u>Id</u>.

As noted in <u>Lund v. Colvin</u>, 2014 WL 1153508 (D. Minn. Mar. 21, 2014), the district courts within the Eighth Circuit are not in agreement about the holding of <u>Nicola.</u>  Some courts have interpreted it to mean that an ALJ's erroneous step-two failure to include an impairment as severe warrants reversal and remand, even when the ALJ found other impairments to be severe and therefore continued sequential analysis.   Other courts have declined to interpret <u>Nicola</u> as establishing a *per se* rule that any error at step two is reversible error, so long as the ALJ continues with the sequential analysis.  <u>See</u> <u>Lund</u> 2014 WL 1153508 at *26 (gathering cases).  The central theme in the cases which hold reversal is not required is that "an error at step two may be harmless where the ALJ considers all of the claimant's impairments in the

evaluation of the claimant's RFC."  Id. (citation omitted).  Therein lies the rub in this case.[20]

The "failure to consider a known impairment in conducting a step-four inquiry is, by itself, grounds for reversal." Spicer v. Barnhart, 64 Fed. Appx. 173, 178 (10th Cir. 2003).  See also Washington v. Shalala, 37 F.3d 1437, 1439-40 (10th Cir. 1994) ("failure to apply the correct legal standard . . . is grounds for reversal.  We note that the ALJ failed to consider the Plaintiff's [impairment] in conducting the step-four inquiry.  This failure, alone, would be grounds for reversal.").  See also Pratt v. Sullivan, 956 F.2d 830, 834-35 (8th Cir. 1992) (same).

In this case, Ms. Chapman's neurocognitive disorder is an undisputed impairment.  Dr. McGrath indicated his testing was valid, and there is no indication in the record to the contrary.  Despite Dr. McGrath's designation as a "*mild* neurocognitive disorder," (AR 1362) in social security lingo this impairment qualifies as a severe impairment because it significantly limits a physical or mental ability to do basic work activities.  20 C.F.R. § 1521.  This

---

[20] In brief, the Commissioner cites Gates v. Astrue, 627 F.3d 1080 (8th Cir. 2010) for the proposition that "as long as the ALJ finds a single impairment severe at step two, any potential error involving another impairment not found severe is generally harmless." See Docket 15, p. 3.  Gates, however, does not stand for such a proposition.  In Gates, the ALJ acknowledged the claimant's alleged mental impairment (depression) but found it was not severe.  Gates, 627 F.3d at 1082.  The claimant in Gates asserted the Commissioner committed error by failing to find her alleged mental impairment was severe and therefore erred by failing to incorporate the corresponding limitations into her RFC.  Id. The Eighth Circuit affirmed, finding Gates' depression was only a mild limitation.  Id.

is so because the limitations imposed by Dr. McGrath have more than a minimal effect on Ms. Chapman's ability to work. Kirby, 500 F.3d at 707.

The Commissioner's argument that any error at step two was harmless because the ALJ's formulation of the RFC incorporated the State agency expert's recommendation to limit Ms. Chapman to "routine" work is not supported by substantial evidence. The ALJ's recitation of Ms. Chapman's RFC (recited verbatim above on pages 45-46 of this opinion) did not include any of Dr. McGrath's *specific* limitations. The court is left to speculate, therefore, about why this is so. The ALJ specifically noted Dr. McGrath's recommendations for Ms. Chapman to avoid "quick thinking" and "multi-tasking" were consistent with the State agency experts' opinions. Did he find Dr. McGrath's other recommendations were inconsistent with the State agency experts' opinions and therefore reject those other recommendations? The court is left to speculate.

This court has found no authority, and the Commissioner cited none, that a limitation to "routine" work is sufficient to articulate or is equivalent to a requirement for dual verbal/written instructions, reduced pace instructions, probe questions to check comprehension of key instructions, and/or the various other limitations on Ms. Chapman's ability to work as outlined by Dr. McGrath.

This case must be remanded. The ALJ did not comply with the requirement that he clarify what weight was given to Dr. McGrath's opinion (see 20 CFR § 404.1527(e)(2)(ii)) (ALJ must explain weight given to state agency

60

expert and all other medical opinions in the file using the relevant factors).  On remand, the ALJ should likewise explain whether his description of Ms. Chapman's RFC encompasses *all* of Dr. McGrath's limitations and if not, which of Dr. McGrath's limitations have been rejected and why.  Only then can this court sufficiently review the Commissioner's decision.  <u>Nicola</u>, 480 F.3d at 887; <u>Parker-Grose v. Astrue</u>, 462 Fed. Appx. 16 (2d Cir. 2012) (Commissioner's assertion that failure to find mental impairment severe at step two was harmless was "unavailing" because "having found that any functional limitations associated with [claimant's] mental impairment were mild and only minimally affected her capacity to work, the ALJ did not take these restrictions into account when determining her [RFC]."

### 2. Whether the Commissioner properly evaluated Ms. Chapman's severe fibromyalgia impairment

The ALJ determined Ms. Chapman's fibromyalgia was a severe impairment.  He also determined, however, that none of Ms. Chapman's impairments, alone or in combination, met the medical severity of the "Listings."  AR 209.  And at step four, he determined that her "longitudinal medical treatment for pain does not weigh in favor of the credibility of the allegation of disability."  AR 212.

Ms. Chapman asserts the ALJ did not properly evaluate her fibromyalgia impairment because he did not compare it to inflammatory arthritis (Listing 14.09D) for purposes of determining whether it was equivalent to a "Listed" impairment at step three of the analysis, and he otherwise failed to apply SSR 12-2p, which instructs that in fibromyalgia cases, the ALJ must look

61

beyond the traditional objective medical findings, both as to the possibility that her fibromyalgia may rise to the level of a listed impairment and when assessing the credibility of her pain complaints.  The Commissioner counters that though the ALJ did not specifically mention SSR 12-2p, he followed its requirements, so no error was committed.

SSR 12-2p provides specific guidance for the Commissioner in how to determine whether Ms. Chapman's severe impairment (fibromyalgia) is medically equal to a listed impairment.  Specifically, in the POLICY INTERPRETATION section, SSR 12-2p explains,

> V.   How do we find a person disabled based on an MDI of FM?
> Once we establish that a person has an MDI of FM, we will consider it in the sequential evaluation process to determine whether the person is disabled.  As we explain in section VI below, we consider the severity of the impairment, whether the impairment medically equals the requirements of a listed impairment, and whether the impairment prevents the person from doing his or her past relevant work or other work that exists in significant numbers in the national economy.
>
> VI.  How do we consider FM in the sequential evaluation process?
> As with any adult claim for disability benefits, we use a 5-step sequential evaluation process to determine whether an adult with an MDI of FM is disabled.
>
> ***
>
> C.   At Step 3, we consider whether the person's impairment(s) meets or medically equals the criteria of any of the listings in the Listing of Impairments in appendix 1, subpart P of 20 CFR part 404 (appendix1).  FM cannot meet a listing in appendix 1 because FM is not a listed impairment.  At step 3, therefore, we determine whether FM medically equals a listing (for example, listing 14.09D in the listing for inflammatory arthritis), or whether it medically

> equals a listing in combination with at least one other
> medically determinable impairment.

>         ***

Id. at pp. 7-8.

The Social Security Administration's regulations do not contain much guidance on the subject of how the Commissioner is to go about determining whether a claimant's impairment is medically equivalent to a listed impairment.   The Administration has published a non-binding guideline Program Operations Manual (POMS).  It states in relevant part:

> DI 24505.015 Finding Disability Based on the Listing of
> Impairments
>
> **How do we determine medical equivalence?**
> ***
>
> b.  If the claimant has an impairment that is not described in
> the Listing of Impairments, we will compare their findings with
> those for closely analogous listed impairments. If the findings
> related to the claimant's impairment are at least of equal
> medical significance to those of a listed impairment, we
> determine their impairment is medically equivalent to the most
> closely analogous listing.
>
> c.  If the claimant has a combination of impairments, none of
> which meets a listing, we will compare their findings with those
> for closely analogous listed impairments. If the findings related
> to the claimant's impairments are at least of equal medical
> significance to those of a listed impairment, we determine the
> combination of impairments is medically equivalent to the most
> closely analogous listing.

See https://secure.ssa.gov/poms.nsf/lnx/0424505015 (last checked November 30, 2016).  In this instance, the ALJ's "Listing" analysis regarding Ms. Chapman's physical impairments is recited in its entirety below:

> The undersigned does not find medical evidence to show the
> claimant's diabetes affects another body system that meets or
> equals a listing.  The medical evidence in this record does not
> show laboratory or clinical findings regarding the claimant's
> fibromyalgia, diabetes, or in combination with her obesity, that
> meets or medically equals a listing.  Moreover the record does
> not contain an opinion from a treating or examining acceptable
> medical source to support the finding of listing-severity of the
> claimant's severe impairments.

AR 209.

The ALJ did not indicate which Listing he considered most closely analogous for purposes of comparison.  The ALJ's step-three analysis is therefore practically impossible for a reviewing court to analyze.  This court cannot speculate as to the ALJ's reasoning regarding the Listing equivalence. Collins v. Astrue, 648 F.3d 869, 872 (8th Cir. 2011).  On remand the ALJ should provide a more thorough and reviewable discussion regarding whether Ms. Chapman's fibromyalgia, alone or in combination with her other impairments, meets or equals a Listed impairment at step three of the analysis.

Ms. Chapman asserts the ALJ likewise erred because he relied too heavily on the lack of objective medical evidence when evaluating the credibility of her fibromyalgia pain complaints.  The ALJ's discussion regarding this subject is found at AR 213:  The ALJ stated

> The undersigned accepts the claimant's testimony that
> fibromyalgia and chronic pain impact her ability to perform
> basic work-related activities.  The claimant has documented
> medical history of chronic pain complaints in her arms, legs,
> joints and muscles.  However, the objective medical evidence of
> record does not fully support the credibility of the claimant's
> allegation that she is unable to engage in substantial gainful
> activity due to fibromyalgia.  While medical records show the
> claimant has experienced symptoms of fibromyalgia, the
> medical findings as a whole do not reflect a loss of strength,

limited range of motion, and fatigue to support the allegation of disability. Examinations showed gait and muscle strength/tone were within normal limits, and no signs of joint problems. The claimant was seen at a clinic in July 2013 for complaints of multiple joint pains, but the objective examination of the claimant's joints was noted to be normal with full range of motion, and no active swelling or synovitis at any joint.

The evidence of the claimant's longitudinal medical treatment for pain does not weigh in favor of the credibility of the allegation of disability. The claimant reported to a clinic that the regular regimen of hydrocodone alleviated both her pain and calmed her anxiety. In December 2012, the claimant visited Southeastern Behavioral Healthcare and reported an increase in Cymbalta helped her mood and fibromyalgia pain, which had been quite decreased over the previous few months. The claimant requested a pain medication in July, 2013, as hydrocodone or Percocet had worked well for her. The claimant reported during follow-up in August, 2013 that she was very happy with the improvement in her joint and body pains after taking Indomethacin and Prednisone. In October, 2013, the claimant complained during follow-up that her body pains had returned and Indomethacin provided no relief. The claimant requested a prescription for hydrocodone, as it helped in the past, but the physician refused to prescribe the medication.[21] The claimant was concerned about not functioning without hydrocodone to treat fibromyalgia. Later in February, 2014, the claimant underwent annual physical examination at Woman's Health and denied any pain issues. Based on the undersigned's review of the entire case record, the overall level of the claimant's treatment for chronic pain and reported positive effects from pain medication do not suggest disabling pain.

AR 213.

The Eighth Circuit has noted that fibromyalgia is a disease which is

"chronic, and diagnosis is usually made after eliminating other conditions, as

---

[21] As an aside, the court observes that throughout Dr. Geise's treatment of Ms. Chapman, he tried several times without success to "cut off" her use of hydrocodone for pain relief. Ms. Chapman did not list hydrocodone as one of her regular medications during her administrative hearing in April, 2014. AR 257. She received another hydrocodone prescription, however, in June, 2014. AR 1539.

there are no confirming diagnostic tests . . . We have long recognized that

fibromyalgia has the potential to be disabling." Forehand v. Barnhart, 364

F.3d 984, 987 (8th Cir. 2004) (citations omitted, punctuation altered).  Where

the ALJ rejected a claimant's fibromyalgia symptoms and complaints because

they were not "substantiated by objective medical testing" the Eighth Circuit

reversed and remanded the case because the ALJ "misunderstood fibromyalgia"

which likewise adversely affected the ALJ's formulation of the claimant's RFC

analysis.  Garza v. Barnhart, 397 F.3d 1087, 1089 (8th Cir. 2005).

> Fibromyalgia is defined as a syndrome of chronic pain of
> musculoskeletal origin but uncertain cause.  Stedman's Medical
> Dictionary, at 671 (27th ed. 2000).  Further, "[t]he
> musculoskeletal and neurological examinations are normal in
> fibromyalgia patients, and there are no laboratory
> abnormalities."  Harrison's Principles of Internal Medicine, at
> 2056 (16th ed. 2005).  The American College of Rheumatology
> nonetheless has established diagnostic criteria that include
> "pain on both sides of the body, both above and below the
> waist, [and] point tenderness in at least 11 of 18 specified
> sites."  Stedman's Medical Dictionary, supra.

Johnson v. Astrue, 597 F.3d 409, 410 (1st Cir. 2010).

In Johnson, as in this case, the treating physician's opinion regarding

the claimant's fibromyalgia and its effect on her ability to work was not given

controlling or even significant weight.[22]  Johnson, 597 F.3d at 412.  The ALJ

---

[22] In this case, Dr. Geise's opinion was not ever considered by the ALJ because
it was not introduced into the administrative record until after the ALJ issued
his decision.  Dr. Geise's opinion was not submitted until the Appeal Council
stage of the proceedings.  In cases involving submission of supplemental
evidence subsequent to the ALJ's decision, the record may include evidence
submitted after the hearing and considered by the Appeals Council.  Bergmann
v. Apfel, 207 F.3d 1065, 1068 (8th Cir. 2000).  "In practice, this requires [the
court] to decide how the ALJ would have weighed the new evidence had it
existed at the initial hearing." Id.

rejected the opinion because it relied primarily upon the claimant's subjective complaints and lacked supporting objective medical findings.  Id.  Because of the unique nature of fibromyalgia, however, the First Circuit criticized the ALJ's reasons for giving little weight to the treating physician's opinion:

> Dr. Ali's "need" to rely on claimant's subjective allegations . . . was not the result of some defect in the scope or nature of his examinations nor was it even a shortcoming.  Rather, "a patient's report of complaints, or history, is an essential diagnostic tool" in fibromyalgia cases, and a treating physician's reliance on such complaints "hardly undermines his opinion as to [the patient's] functional limitations."  Green-Younger v. Barnhart, 335 F.3d 99, 107 (2d Cir. 2003)(internal punctuation and citation omitted).  Further, since trigger points *are* the only "objective" signs of fibromyalgia, the ALJ "effectively [was] requiring objective evidence beyond the clinical findings necessary for a diagnosis of fibromyalgia under established medical guidelines," and this, we think, was error.

Id. at 412 (emphasis in original).  The court concluded by finding the RFC formulated by the ALJ was "significantly flawed."  Id.  See also Rogers v. Commissioner of Soc. Security, 486 F.3d 234 (6th Cir. 2007).

In Rogers, the Sixth Circuit likewise reversed and remanded a fibromyalgia case.  Rogers, 486 F.3d at 250.  "[U]nlike medical conditions that can be confirmed by objective medical testing, fibromyalgia patients present no objectively alarming signs. . . .[F]ibromyalgia is an elusive and mysterious disease which causes severe musculoskeletal pain.  . . . [F]ibromyalgia patients manifest normal muscle strength and neurological reactions and have a full range of motion."  Id. at 243-44 (citations omitted, punctuation altered).  The Rogers court held the ALJ erred by adopting into the RFC opinions of physicians who dismissed the claimant's complaints because they were not

67

substantiated by objective findings.  Id. at 244-46.  "[I]n light of the unique evidentiary difficulties associated with the diagnosis and treatment of fibromyalgia, opinions that focus solely on objective evidence are not particularly relevant."  Id. at 245.

As in Garza, Johnson and Rogers, it appears  the ALJ in this case effectively required objective evidence beyond the accepted clinical findings necessary for fibromyalgia.  As such, the ALJ misunderstood Ms. Chapman's fibromyalgia and as a result, he rejected its associated limitations which should have been included in her RFC.  Accordingly, the ALJ's formulation of the RFC was "significantly flawed" and this case should be reversed and remanded.  Garza , 397 F.3d at 1089 ; Johnson, 597 F.3d at 412; Rogers, 486 F.3d at 243-44.

Social Security Ruling ("SSR") 12-2p regarding the proper evaluation of fibromyalgia cases went into effect on July 25, 2012, well before the ALJ in this case issued his written decision on May 15, 2014.  The Ruling carefully explains the specific criteria that should be considered both to establish the existence of the medical impairment of fibromyalgia and to evaluate the credibility of a claimant's associated subjective pain complaints. "Although Social Security Rulings do not carry the force and effect of the law or regulations, . . . they are binding on all components of the Social Security Administration."  Kosyjana v. Commissioner, Social Security Administration, 2014 WL 5308028 at *2 (D. Md. Oct. 15, 2014) (citations omitted, punctuation altered).

68

The Ruling cautions that when determining the claimant's RFC, the longitudinal record should be considered whenever possible because the nature of fibromyalgia necessarily includes "symptoms . . . that can wax and wane so that a person may have bad days and good days." Id. at p. 8.  The Ruling instructs consulting examiners to be aware that fibromyalgia symptoms "may vary in severity over time and may even be absent on some days . . ." Id. at p. 6.  On remand, the ALJ should clarify how the application of SSR 12-2p affects the evaluation of the medical evidence and the formulation of Ms. Chapman's RFC, including the credibility determination.

### 3. Whether the Commissioner's RFC formulation is supported by substantial evidence

Next, Ms. Chapman asserts the Commissioner's formulation of the RFC was not supported by substantial evidence.  Ms. Chapman bases this claim in part upon her assertion that although the ALJ purported to rely upon the opinions of the State agency experts, there are, Ms. Chapman alleges, unexplained conflicts between the RFC formulated by the ALJ and the State agency experts' opinions.

First, Ms. Chapman faults the ALJ for failing to address the conflict between the State agency experts' finding that Ms. Chapman had one or two episodes of decompensation (AR 304) and his own finding that she had zero episodes of decompensation (AR 209-10).  The court finds this argument a non-starter.  To have significance for purposes of the "B" criteria in the Listed mental impairments, the claimant must have had "repeated" episodes of decompensation, each of "extended duration." See e.g. Listing 12.06 (anxiety

disorders).  In the introductory section which describes the general terms for Listings within the 12.00 Listings (mental disorders) the following explanation is found:

> Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence or pace.  Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two).  Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g. hospitalizations, placement in a halfway house, or a highly structured  and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.
>
> *The term repeated episodes of decompensation, each of extended duration in these listings means three episodes within one year, or an average of once every 4 months, each lasting for at least 2 weeks.*  If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence.

See 20 C.F.R. Subpt. P., App. 1, Pt. 404, § 12.00 C.4 (emphasis added).

The parties' stipulated facts indicate Ms. Chapman had, at most, one episode of decompensation within the relevant time frame (i.e. between the previously adjudicated date of onset—June 21, 2012, and the date of the ALJ's decision—May 15, 2014).  That incident occurred when Ms. Chapman was hospitalized overnight on July 26, 2012.  See stipulated fact no. 83, Docket No. 11.  The episode was not of extended duration.  And because it is the only

documented episode, Ms. Chapman cannot argue sufficient numbers of shorter episodes equate to repeated episodes of extended duration for purposes of satisfying the "B" criteria pursuant to the explanation above.  Therefore, the fact that the state agency experts found "one or two" episodes of decompensation while the ALJ found none does not avail Ms. Chapman: either way, the "B" criteria are not satisfied.

Ms. Chapman also asserts the state agency experts placed moderate limitations upon her ability to carry out detailed tasks, to maintain attention and concentration for extended periods of time, and to sustain an ordinary routine without special supervision.  The state agency experts indicated these limitations limited her to performing only "simple" tasks, and even then only when her pain was under control.  AR 308.  But, Ms. Chapman notes, the ALJ's formulation of the RFC indicated she could perform "routine" tasks, which Ms. Chapman says is insufficient to encompass the state agency experts' limitations and is not the same as limiting her to "simple" tasks.

Ms. Chapman asserts only jobs which are limited to a reasoning level 1 qualify as those which require "simple" instructions.  The Commissioner argues that even assuming "routine" does not equal "simple" (i.e. a reasoning level of one), the error is harmless because one of the jobs identified by the vocational expert pursuant to the ALJ's hypothetical—motel house cleaner— met that requirement.

Residual functional capacity is "defined as what the claimant can still do despite his or her physical or mental limitations."  Lauer v.  Apfel, 245 F.3d

700, 703 (8th Cir. 2001) (citations omitted, punctuation altered).   "The RFC assessment is an indication of what the claimant can do on a 'regular and continuing basis' given the claimant's disability.  20 C.F.R. § 404.1545(b)." Cooks v. Colvin, 2013 WL 5728547 at *6 (D.S.D. Oct. 22, 2013).  The formulation of the RFC has been described as "probably the most important issue" in a Social Security case.  McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) abrogation on other grounds recognized in Higgins v. Apfel, 222 F.3d 504 (8th Cir. 2000).

When determining the RFC, the ALJ must "consider the combination of the claimant's mental and physical impairments."  Lauer, 245 F.3d at 703. Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all the relevant evidence . . . a claimant's residual functional capacity is a medical question."  Id. (citations omitted). "Some medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace."  Id. (citations omitted).  Finally, "[t]o find that a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world."  Reed v. Barnhart, 399 F.3d 917, 923 (8th Cir. 2005) (citations omitted, punctuation altered).

Both Ms. Chapman and the Commissioner cite Hulsey v. Astrue, 622 F.3d 917 (8th Cir. 2010), as supportive of their respective positions.  In that

case, as here, the claimant asserted the ALJ's formulation of her RFC did not

adequately account for her mental impairment (borderline intellectual

functioning) because of her inability to follow detailed instructions.  Id. at 922.

The Hulsey court explained that unskilled or work that is specific vocational

preparation ("SVP") level one or two is work that "needs little or no judgment to

do simple duties that can be learned on the job in a short period of time."

(citing 20 C.F.R. § 416.968(a)).

> Unskilled work is the "least complex type [ ] of work, SSR 82-41,
> 1982 WL 31389 (1982), corresponding to a specific vocational
> preparation (SVP) level of one or two in the DOT.  SSR 00-4P,
> 2000 WL 189704 (Dec. 4, 2000).  The SVP level listed for each
> occupation in the DOT connotes the time needed to learn the
> techniques, acquire the information, and develop the facility
> needed for average work performance.  At SVP level one, an
> occupation requires only a short demonstration, while level two
> covers occupations that require more than a short
> demonstration but not more than one month of vocational
> preparation.  2 Dictionary of Occupational Titles, App. C, at
> 1009 (4th ed. 1991).

Hulsey, 622 F.3d at 922-23.

In Hulsey, the claimant asserted the ALJ's hypothetical was insufficient

because it did not account for her inability to follow detailed work instructions.

Id. at 923.  The court ultimately rejected her claim, because the occupation

identified by the vocational expert ("cleaner, housekeeping") had a reasoning

level 1 designation.  The court also explained the meaning of the reasoning

level designation:

> Each occupation in the DOT is coded with a reasoning
> development level, which corresponds to the ability to follow
> instructions and solve problems that is required for satisfactory
> job performance.  2 Dictionary of Occupational Titles, supra,
> App. C, at 10009-11.  Only occupations with a reasoning

> development level of one necessarily involve only simple
> instructions.  At reasoning development level two, occupations
> might necessitate applying "commonsense understanding to
> carry out detailed but uninvolved written or oral instructions"
> and dealing with "problems involving a few concrete variables in
> or from standardized  situations."  The occupations at level
> three, . . . might involve applying "commonsense understanding
> to carry out instructions furnished in written, oral, or
> diagrammatic form" and dealing with "problems involving
> several concrete variables in or from standardized situations."
> Id. at App. C, at 1011.

Hulsey, 622 F.3d at 923.

The meaning of the SVP level and the reasoning level is also nicely

articulated in Taillefer v. Colvin, 2016 WL 617121 at *11 n. 8 and 9 and *20.

(D. Minn. Jan. 29, 2016).  There the court explained that while the SVP level of

the job corresponds to the time needed to learn the skills of the particular job,

the reasoning level refers to a separate general educational development (GED)

level.  Id. at n. 9.  The GED requirements are assigned in the Dictionary of

Occupational Titles for reasoning, math, and language.  DOT, App. C:

Components of the Definition Trailer, Part III.

> GED requirements "embrace those aspects of education (formal
> and informal) which are required of the worker for satisfactory
> job performance.  This is education of a general nature which
> does not have a recognized, fairly specific occupational
> objective.  Ordinarily, such education is obtained in elementary
> school, high school, or college.  However, it may be obtained
> from experience and self-study."

Taillefer, Id. at n. 9 (citing DOT, App. C: Components of the Definition Trailer,

Part III).

Finally, in Moore v. Astrue, 623 F.3d 599, 604-05 (8th Cir. 2010), the

court rejected the argument that only jobs with the DOT reasoning level one

74

designation qualify as those which can be performed by someone capable of performing "simple, routine" tasks.  Id. at 604.  In that case, the ALJ's hypothetical to the vocational expert indicated the claimant was capable of "simple, routine and repetitive work at the unskilled level."  Id.  The jobs identified by the vocational expert required reasoning level 2, but the claimant believed only level 1 was encompassed by the ALJ's hypothetical.

> Moore contends the hypothetical could only be satisfied by occupations requiring "Level 1" reasoning, defined by the DOT as the ability to [a]pply commonsense understanding to carry out simple one-or two-step instructions." Dictionary of Occupational Titles, (4th ed. 1991, p. 1011).
>
> The ALJ did not err in relying on the vocational expert's testimony.  In the hypothetical, the ALJ did not limit "simple" job instructions to "simple *one- or two-step* instructions" or otherwise indicate that Moore could perform only occupations at a DOT Level 1 reasoning level.  Indeed, the Level 2 reasoning definition refers to "detailed but *uninvolved* instructions. DOT at 1011 (emphasis added).  The dictionary defines "uninvolved" as "not involved" and in turn defines "involved" as "complicated, intricate." Webster's New Third Int'l Dictionary, 1191, 2499 (2002).  There is no direct conflict between "carrying out simple job instructions" for "simple, routine and repetitive work activity," as in the hypothetical, and the vocational expert's identification of occupations involving instructions that, while potentially detailed, are not complicated or intricate.

Id.

The Moore court also emphasized that reliance on the DOT definitions as absolute authority for job requirements in every situation is misplaced.  Id. at 604.  "The DOT itself cautions that its descriptions may not coincide in every respect with the content of jobs as performed in particular establishments or certain localities . . . In other words, not all of the jobs in every category have

75

requirements identical to or as rigorous as those listed in the DOT." Id. (citation omitted).

As explained above, when the ALJ determined Ms. Chapman's mental RFC, he distilled all of Dr. McGrath's limitations into one (routine work) and assumed Dr. McGrath's limitations to avoid "quick thinking" and "multi-tasking" were consistent with the State agency physician's limitation to "routine work."  Pursuant to Moore, this court is not persuaded the ALJ's formulation of the RFC is defective per se because it used the word "routine" rather than "simple."

But for the reasons explained in section D.1 above, the ALJ's failure to explain what weight he assigned to Dr. McGrath's opinion precludes this court's ability to review the accuracy of the RFC.   This court has found no authority, and the Commissioner cited none, that a limitation to "routine" work is sufficient to articulate or is equivalent to a requirement for dual verbal/written instructions, reduced pace instructions, probe questions to check comprehension of key instructions, and/or all of the various other limitations on Ms. Chapman's ability to work as outlined by Dr. McGrath.  The court cannot discern, however, whether the ALJ intended the RFC as he articulated it to encompass such limitations.[23]

This case must be remanded.  The ALJ did not comply with the requirement that he clarify what weight was given to Dr. McGrath's opinion

---

[23] The vocational expert's testimony shed no light on the subject because he was not asked whether the jobs he identified were compatible with such limitations.

(see 20 CFR § 404.1527(e)(2)(ii)) (ALJ must explain weight given to state agency expert and all other medical opinions in the file using the relevant factors).  On remand, the ALJ should likewise explain whether his description of Ms. Chapman's RFC is intended to encompass *all* of Dr. McGrath's limitations and if not, which of Dr. McGrath's limitations have been rejected and why.  Only then can this court properly review the sufficiency of the RFC as it was formulated by the ALJ.

### 4.  Whether the Commissioner fully and fairly developed the record.

Finally, Ms. Chapman asserts the Commissioner failed to fully and fairly develop the record.  The ALJ placed "great weight" on the findings of two state agency experts, neither of whom treated or examined Ms. Chapman.  And, as noted above, the state agency experts did not have the benefit of Dr. McGrath's neuropsychological testing because it had not yet occurred at the time they formed their opinions.

Though the ALJ concluded at least part of his RFC formulation was "consistent" with both the state agency physicians' opinions and Dr. McGrath's findings, the state agency physicians were not consulted to confirm that conclusion.  They were not asked to review Dr. McGrath's report to determine whether it was consistent with, or had any effect upon their opinions.  Though most of Dr. Geise's voluminous medical notes were contained in the administrative record, Dr. Geise had not given nor had he been asked to provide his opinion regarding Ms. Chapman's ability to function in the workplace at the time of the administrative hearing.  The ALJ made a special

77

note of the absence of Dr. Geise's opinion, both during the administrative

hearing, and in his written decision.  AR 215, 262.  Consequently, the ALJ was

unable to weigh Dr. Geise's opinion pursuant to the factors outlined in 20 CFR

§ 404.1527.

    In brief, the Commissioner asserts Ms. Chapman's argument that the

ALJ did not adequately develop the record relies on inapposite or "outdated"

case law.  The cases cited in this section of Ms. Chapman's brief are:

- McCoy v. Astrue, 648 F.3d 605, 612 (8th Cir. 2011);
- Johnson v. Astrue, 627 F.3d 316, 319-20 (8th Cir. 2010);
- Pate-Fires v. Astrue, 564 F.3d 935, 943 (8th Cir. 2009);
- Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005);
- Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004);
- Bowman v. Barnhart, 310 F.3d 1080, 1084 (8th Cir. 2002);
- Hustell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001;
- Lauer v. Apfel, 245 F.3d 700, 705 (8th Cir. 2001)
- Freeman v. Apfel, 208 F.3d 687, 692  (8th Cir. 2000)
- Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); and
- Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994).

    None of these cases have been overruled or negated by statute or

administrative ruling.

    Ms. Chapman acknowledges she bears the burden of persuasion to prove

disability and to demonstrate her RFC.  Stormo, 377 F.3d at 806.  She asserts,

however, that the ALJ nevertheless bears the responsibility to fully and fairly

develop the record.  Id.   This is true even when the claimant is represented by

an attorney throughout the administrative proceedings.  Johnson, 627 F.3d at

319-20.  If the record is insufficient to determine whether the claimant is

disabled, the ALJ must develop the record.  McCoy, 648 F.3d at 612.  The ALJ

is required to seek additional evidence or clarification only if a "crucial issue" is

undeveloped.  Ellis, 392 F.3d at 994.

The ALJ's duty to develop the record is established by the Social Security

Administration's own rule.  20 CFR § 404.1512(d).  That regulation states in

relevant part:

> (d) *Our responsibility*. Before we make a determination that you
> are not disabled, we will develop your complete medical history
> for at least the 12 months preceding the month in which you
> file your application unless there is a reason to believe that
> development of an earlier period is necessary or unless you say
> that your disability began less than 12 months before you filed
> your application. We will make every reasonable effort to help
> you get medical reports from your own medical sources when
> you give us permission to request the reports.
>
> (1) "Every reasonable effort" means that we will make an
> initial request for evidence from your medical source and, at
> any time between 10 and 20 calendar days after the initial
> request, if the evidence has not been received, we will make one
> follow up request to obtain the medical evidence necessary to
> make a determination. The medical source will have a minimum
> of 10 calendar days from the date of our follow up request to
> reply, unless our experience with that source indicates that a
> longer period is advisable in a particular case.
> (2) By "complete medical history," we mean the records of
> your medical source(s) covering at least the 12 months
> preceding the month in which you file your application. If you
> say that your disability began less than 12 months before you
> filed your application, we will develop your complete medical
> history beginning with the month you say your disability began
> unless we have reason to believe your disability began earlier. If
> applicable, we will develop your complete medical history for the
> 12-month period prior to (1) the month you were last insured
> for disability insurance benefits (see § 404.130), (2) the month
> ending the 7-year period you may have to establish your
> disability and you are applying for widow's or widower's benefits
> based on disability (see § 404.335(c)(1)), or (3) the month you

> attain age 22 and you are applying for child's benefits based on
> disability (see § 404.350(e)).

See 20 C.F.R. 404.1512(d).

A claimant's ability to function in the workplace is *the most* "crucial issue" in a social security disability case.  McCoy, 683 F.2d at 1147.  The Commissioner asserts the ALJ did not err by failing to request an opinion from Ms. Chapman's longtime treating physician, however, because though the issue was crucial, it was not underdeveloped.  Ellis, 392 F.3d at 994.

The court disagrees.  This is so because the ALJ specifically commented on the absence of an opinion on Ms. Chapman's ability to function in the workplace to "contradict" the non-treating, non-examining state agency physicians.  The absence of clarification is especially troubling in this case, given the ALJ's apparent reliance on an opinion from Dr. McGrath whose opinion he declined to assign weight and whose opinion the state agency physicians never reviewed.

When determining the credibility of Ms. Chapman's subjective complaints for purposes of determining her RFC, the ALJ commented on the lack of opinion evidence from Dr. Geise.  The ALJ discussed several of the factors which bore upon her credibility (see 20 C.F.R. § 404.1529) (listing factors to consider).  One of the credibility factors is medical findings, including statements from the claimant's treating source.  Id. at § 404.1529(c)(1).  The ALJ discussed Ms. Chapman's medical history as found in her records, but concluded:

80

> [t]he record does not include an opinion from a treating source,
> which contradicts the findings of the State agency medical
> consultants and psychological consultants.  The claimant
> testified that a physician restricted her physical activity due to
> her dizzy episodes, and she could not remember the specific
> work restrictions placed on her in the past.  The claimant
> testified that her current treating physician, Dr. Douglas Geise,
> has not placed work restrictions on her.

AR 215.

This statement is misleading and incomplete because the rest of

Ms. Chapman's answer to the ALJ's inquiry explained Dr. Geise had not placed

work restrictions on her because she had not been working.  See hearing

transcript, AR 262.   The ALJ equated this absence of opinion to an

assumption that the treating and/or examining physician, if asked, would not

be supportive of Ms. Chapman's disability application.   But the Eighth Circuit

has repeatedly criticized this practice.  In Hutsell, the court reversed the

Commissioners' denial of benefits and remanded for an award of benefits to the

claimant.  Hutsell 259 F.3d at 714.  In that case, there was no record opinion

from the claimant's treating physician.  The court explained, however, that "[a]

treating doctor's silence on the claimant's work capacity does not constitute

substantial evidence supporting an ALJ's functional capacity determination

when the doctor was not asked to express an opinion on the matter and did not

do so, particularly when that doctor did not discharge the claimant from

treatment.  Id. at  712.  See also Pate-Fires, 564 F.3d at 943; Lauer, 245 F.3d

at 705 (same).

81

After the ALJ denied her claim, Ms. Chapman obtained further records from several of her physicians for submission to the Appeals Council . See AR 1369-1611.  She also submitted a medical source statement from Dr. Geise, explaining Dr. Geise's opinions about her work abilities.  AR 1364-68. Dr. Geise's  opinions did not coincide with the opinions of the state agency physicians.  Id.  The state agency physicians' opinions were the only ones in the record when the ALJ made his decision.  The ALJ had given the state agency physicians' opinions "great weight" and they were, for the most part, adopted by him. AR 214.

The Commissioner argues the ALJ fulfilled his duty to develop the record because Ms. Chapman bore the burden to prove her RFC.  Baldwin v. Barnhart, 349 F.3d 549 (8th Cir. 2003).  This theory was rejected by the Eighth Circuit in Snead v. Barnhart, 360 F.3d 834 (8th Cir. 2004).  In Snead, the claimant made a claim for disability benefits based in part on his congestive heart failure condition.  The ALJ recognized this condition as a severe impairment but "gave no consideration to what effect this underlying heart condition might have on [his] ability to work."[24]  The Eighth Circuit reversed because it found that once the ALJ was aware of the claimant's heart condition, he should have taken steps to develop the record sufficiently to

---

[24] The claimant's treating physician offered an opinion on the ultimate issue (i.e. that the claimant "could not work"), because of the heart condition, but that opinion was rejected by the ALJ without seeking any clarification or further support for it.  Id. at 839.

determine how it limited the claimant's ability to work even if the claimant failed to sufficiently do so himself.  Id. at 839.

The Court forcefully explained that unlike normal Anglo-American legal proceedings, Social Security hearings do not rely on the rigors of the adversarial process to reveal the true facts of a case.  Id. at 838 (citing Schaal v. Gammon, 233 F.3d 1103, 1106 (8th Cir. 2000)) (other citations omitted). Instead, in Social Security proceedings, it is the ALJ's duty to find the truth by fully and fairly developing the record, "independent of the claimant's burden to press his case."  Id.  at p. 838 (citations omitted).

> The ALJ possesses no interest in denying benefits and must act neutrally in developing the record. See Richardson v. Perales, 402 U.S. 389, 410, 91 S. Ct. 1420, 28 L.Ed.2d 842 (1971) ("The social security hearing examiner, furthermore, does not act as counsel. He acts as an examiner charged with developing the facts."); Battles v. Shalala, 36 F.3d 43, 44 (8th Cir.1994) (noting that the Commissioner and claimants' counsel both share the goal of assuring that disabled claimants receive benefits).

Id.

Once the ALJ recognized Ms. Chapman's cognitive impairment, as identified by Dr. McGrath's testing, had not been considered by the only opinions upon which he was relying to form the RFC, the ALJ had the obligation to further develop the record at least as to this issue.  And it is very well established in the Eighth Circuit that a treating physician's opinion is preferred over a non-treating, non-examining physician's opinion as to the abilities of a social security claimant, as limited by his or her undisputed

medical impairment(s).  Snead 360 F.3d  at 839.  Therefore, it was the ALJ's duty to develop the record further to obtain this information.  Id.

The Commissioner further asserts Ms. Chapman must show prejudice to warrant reversal because of the ALJ's failure to develop the record.  LaCroix v. Barnhart, 465 F.3d 881, 886 (8th Cir. 2006).  In LaCroix, the court found no prejudice because the evidence the claimant urged should have been developed was not from an acceptable medical source.  Id. at 886.  This case is distinguishable from LaCroix because Ms. Chapman's missing evidence was from her treating physician—Dr. Geise, who was an acceptable medical source. When Dr. Geise did provide his opinion it was very different from the opinions of the state agency physicians, who never treated and never examined Ms. Chapman.

Pursuant to the applicable Social Security Regulation, Dr. Geise's opinion, had it been in the record, may have had a substantial impact on Ms. Chapman's case because ordinarily the opinions of treating physicians are given controlling weight.  See 20 C.F.R. § 404.1527(c).  "Generally, a treating physician's opinion is given more weight than other sources in a disability proceeding."  Anderson v. Astrue, 696 F.3d 790, 793 (8th Cir. 2012) (citing 20 C.F.R. § 404.1527(c)).

> Indeed, when the treating physician's opinion is supported by proper medical testing and is not inconsistent with other substantial evidence in the record, the ALJ *must* give the opinion controlling weight . . . However, an ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders

> inconsistent opinions that undermine the credibility of such
> opinions.

Id. (citations omitted, punctuation altered, emphasis added).  "Ultimately, the

ALJ must 'give good reason' to explain the weight given the treating physician's

opinion."  Id. (citing 20 C.F.R. § 404.1527(c)(2)).   Additionally, SSR 96-2p

instructs that

> Adjudicators must remember that a finding that a treating
> source medical opinion is not well-supported by medically
> accepted clinical and diagnostic techniques or is inconsistent
> with the other substantial evidence in the case record means
> only that the opinion is not entitled to 'controlling weight,' not
> that the opinion should be rejected.  Treating source medical
> opinions are still entitled to deference and must be weighed
> using all of the factors provided in 20 C.F.R. 404.1527 and
> 416.927.  In many cases, a treating source's medical opinion
> will be entitled to the greatest weight and should be adopted,
> even if it does not meet the test for controlling weight.

> See SSR 96-2p, POLICY INTERPRETATION, at p. 6.

Conversely, the opinion of a consulting physician who examines a

claimant once or not at all does not generally constitute substantial evidence.

"We have stated many times that the results of a one-time medical evaluation

do not constitute substantial evidence on which the ALJ can permissibly base

his decision."  Cox v. Apfel, 345 F.3d 606, 610 (8th Cir. 2003) (citations

omitted).  "This is especially true when the consultative physician is the only

examining doctor to contradict the treating physician."  Id.  Likewise, the

testimony of a vocational expert who responds to a hypothetical based on such

evidence is not substantial evidence upon which to base a denial of benefits.

Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (internal citations omitted).

In Ms. Chapman's case, the ALJ gave "great weight" to the opinions of

the non-treating, non-examining state agency consultants in order to find

Ms. Chapman was not disabled.  AR 214.  But the state agency physicians did

not have the opportunity to consider the opinion of the examining physician

(Dr. McGrath) and the ALJ never saw or considered the opinion of the treating

physician (Dr. Geise).  Ms. Chapman has therefore sufficiently shown the

prejudice required by LaCroix to require reversal and remand for proper

consideration of Dr. Geise's opinion.  The ALJ will also have the benefit of all of

the other medical records which were not part of the record at the time the first

ALJ decision was made, but which were submitted to the Appeals Council.

Along with Dr. Geise's opinion, these records should likewise be fully

considered and given appropriate weight pursuant to 20 C.F.R. § 404.1527 on

remand.

## E.    Type of Remand.

For the reasons discussed above, the Commissioner's denial of benefits is

not supported by substantial evidence in the record.  Ms. Chapman requests

reversal of the Commissioner's decision with remand and instructions for an

award of benefits, or in the alternative reversal with remand and instructions

to reconsider her case.

42 U.S.C. §  405(g) governs judicial review of final decisions made by the

Commissioner of the Social Security Administration.  It authorizes two types of

remand orders: (1) sentence four remands and (2) sentence six remands.  A

sentence four remand authorizes the court to enter a judgment "affirming,

modifying, or reversing the decision of the Secretary, with or without

remanding the cause for a rehearing." 42 U.S.C. § 405(g).   A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling.  Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000).  A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings.  Id.  Neither sentence six situation applies here.

A sentence four remand is applicable in this case.  Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding."  Buckner, 213 F.3d at 1011.  In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the court, out of proper deference to the ALJ the proper course is to remand for further administrative findings.  Id., Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be clarified and properly evaluated.  See also  Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability).  Therefore, a remand for further administrative proceedings is appropriate.

## CONCLUSION and RECOMMENDATION

Based on the foregoing law, administrative record, and analysis, this court respectfully RECOMMENDS to the district court that Ms. Chapman's motion to reverse and remand (Docket 12) be GRANTED and that the Commissioner's motion to affirm (Docket 14) be DENIED.  It is further RECOMMENDED that the Commissioner's decision be REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 16th day of December, 2016.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge

88